Ohms vs. The State.

## Ohms vs. The State.

*April 27 — May 11, 1880.*

CRIMINAL LAW AND PRACTICE. *Reversal of judgment for failure of trial judge to hear motion for new trial.*

1. A person accused of crime, after verdict against him, has a right to the solemn opinion of the *judge before whom the cause was tried,* after a careful hearing of all that may be alleged against the justice of the verdict, that it ought to stand.

2. Where, therefore, the evidence upon which a verdict of guilty of murder

in the first degree was found, was not overwhelming, and the accused was unable to obtain a proper hearing of his motion for a new trial, because it was inconvenient for the trial judge (who sat in place of the judge of the circuit in which the trial was had) to remain and hear the same, and such judge erroneously supposed that the motion might properly be heard by the judge of the circuit, this court reverses the judgment and orders a new trial, without determining whether the verdict was unsupported by the evidence, or whether there was error in the instructions given to the jury.

3. The fact that the accused, failing, after due effort, to get his motion heard by the trial judge, subsequently moved the judge of the circuit for the same relief, does not waive or cure the error above stated.

ERROR to the Circuit Court for *Green* County.
The case is stated in the opinion.
*B. Dunwiddie,* for plaintiff in error.
*The Attorney General,* for the state.

TAYLOR, J. The plaintiff in error was tried and convicted of the murder of his father. The evidence shows that the father of the accused was killed on the 19th of June, 1878, near his house in Green county, between the hours of ten and eleven o'clock in the evening of said day; that the death was occasioned by pistol shots; and that none of the family of the deceased were at home at the time he was killed. His wife and daughter, the only persons composing his family, were absent at a prayer meeting at the time. Several persons heard shots fired, which were probably the ones which caused his death. The deceased was found near the barn, in a potato field, lying on his face, dead. A club was found near him, with some blood on it, and one of the horses of the deceased, which he kept in the stable, was found outside of the stable, with a bridle on.

The evidence tending to establish the guilt of the son is, in substance, that he was about twenty-two years old at the time of the trial; that he was sickly and had been for several years; that something more than two years before the death

of the father, he and his son had difficulty, and the father had refused to furnish any more money for medical attendance upon the son, and the son left and worked for his board with a man living near Janesville for about a year; that he then returned to his father and lived with him again for about a year, and until in May, 1878, when, the father again refusing him money to get medical attendance, he again left and went to Janesville, where he remained, doing no work and sleeping most of the time in a livery barn, and, as he claimed, getting some medical attendance. After he left home, in 1878, he corresponded with his sister, who was living with their father, and this correspondence was put in evidence by the state. The evidence tends to show that the father was a hard and unfeeling man, and that his son *Frederick*, when he left him in 1876, entertained no friendly feelings towards him.

The state, to show the feeling of the son towards his father, introduced two letters, one written May 5, 1876, addressed to a young man with whom he was intimate, living near his father, named Charles Coates, in which he makes use of the following language, referring to his father: "I wish the Lord some one would give the old man a deal of a pounding. Charles, if he ever goes to cussing you, I wish you would give him a good shaking up.. As soon as I get well, I will make him a visit, too;" and one written December 5, 1876, addressed to his brother William, in which he uses the following language: "I don't want to eat the old man's grub unless I have worked for it. I am not well yet, and don't think that I ever will get well. I am getting discouraged about this doctor business. Am getting no relief. That old man is the blame of my being sick yet; if he would take care of me when I told him, I would have been well before this time. But he had an idea of killing me, but if I get around again he will suffer for it." A witness by the name of Frank Graves testified on the part of the state that he knew the prisoner, though not intimately acquainted with him, and that he and prisoner were husking

corn together in November, 1877, and the prisoner then said " his father was a mean man; wished somebody would shoot the old son of a bitch; that he, the prisoner, would do it himself if he could get a chance."

This is all the evidence there is in the case showing any threats of violence made by the son against his father.   The evidence of the witness Graves was shaken some by his cross examination, and from the fact that he stated that when he heard of the murder he thought of the conversation which he detailed in his evidence, but said nothing about it at the inquest or to any one until the Sunday before the trial, and that he said he had never spoken to the defendant until he was husking corn with him, when he says the conversation took place.   The mother and daughter testify that after the son came home in 1877, there was no quarrel between the father and son, and none when *Frederick* left home in May, 1878; and the correspondence introduced in evidence which took place after he left in May, 1878, does not show any threatening language, or even abusive language, of the father.

The evidence shows that the accused had a pistol shortly before he left home in May, 1878, but that he sold it to one Walter Colton the Saturday or Sunday before he left home in May.   No pistol was found upon the prisoner at the time of his arrest, or with any of his effects, or in any place where he had been staying after he left home in May.

The other evidence tending to show that the accused probably committed the murder, was the evidence of the conductor, two brakemen and a passenger on the train going from the west into Janesville on the morning of the 20th of June, 1878.   The train stopped at a station called Juda, about six miles from the place of the murder, about 7:30 in the morning.   These witnesses all testify that but one passenger got on the train at that station that morning; that he got on upon the north side of the train, which was very unusual; that he seemed excited, and remained on the platform until after the

train left the station. He paid his fare to Janesville, and left the train at that place, getting off, not on the platform, but on the other side of the train, among the tracks. The conductor and brakemen recognized the accused as the person who got on at Juda on that morning. These witnesses saw the prisoner the next day at Juda, and testify that they recognized him as the man who got on the train at that place the day before. A witness for the defendant testified that he saw the person who got on the train at Juda that morning; that the man came down the north road; that he got on the train on the north side; that the man had on blue overalls and dark coat; that he was within fifteen or twenty yards of him; that this man was not the accused; that he had seen the accused many times before his arrest.

A witness for the defendant, Wesley Allen, testified that he saw the accused in Janesville on the morning of the 19th " or 20th " of June, 1878, before seven o'clock in the forenoon. William Watson is of the opinion he saw the accused in Janesville on the evening of the 19th of June, about eight o'clock, but is not positive it was the 19th. Henry Blunk saw the accused in Janesville, as he thinks, a day or two before the murder. Robert Graham testified that on the day before the arrest (which would be the 19th of June) he saw the defendant coming out of a barn, in the morning, before seven o'clock, looking as though he had just got up. The barn was the one in which the accused claims he slept. The accused testifies that he was in Janesville all the time from the time he left home, in May, until June 20th, when he was arrested for the murder of his father, and that he did not take the train on the morning of the 20th of June, at Juda, and denies all knowledge of how his father was killed; denies making the statement sworn to by the witness Graves; and also testifies that the letter addressed to Charles Coates, and having his signature, was written by his brother George, and not by himself; that George

signed his name to the letter, and that the letter was not in his handwriting.

The only other evidence tending to connect the accused with the murder was the evidence as to the tracks leading from the place where the father was killed. There was evidence tending to show that these tracks were such as might have been made by the boots which the accused wore. The tracks were considerably shorter than the boots. The boots were of a kind and size which were common, and there was no peculiarity in the tracks which indicated that they must have been made by the defendant's boots. The most that could be said of this evidence was what the learned circuit judge said about it, "that it tended to show that they might have been made by the defendant's boots." The tracks were not apparently so different from those which the defendant's boots would make as to render it impossible that they could have been made by them. There was also an item of evidence given by the daughter, that, when they came home on the night of the murder, one of the dogs of the deceased was not at home, but was found at a neighbor's some distance away; that this dog would not follow any of the family away from home except the accused; but that he would sometimes leave home when the accused was not there.

The state also gave in evidence an occurrence which happened at the funeral of the father. One of the sisters fainted, and the accused fainted, or appeared to faint, and when he came out of the faint the minister and another person urged him to confess. The accused replied, " that he had nothing to confess; that he was innocent." The foregoing is substantially the evidence given on the trial which tended to fasten the guilt of the murder upon the accused; and upon this evidence the jury, under the instructions of the court, rendered a verdict of guilty of murder in the first degree.

I have made this statement of evidence tending to show

the guilt of the accused, not because this court would consider itself justified in setting aside the verdict as unsupported by the evidence, nor as intimating that we would have reversed an order of the trial judge refusing to grant a new trial for the insufficiency of the evidence, but simply for the purpose of showing that the evidence is not necessarily conclusive of the guilt of the accused, and that in a case of this kind, where the consequences of a mistake are so terrible to the accused, he should have the advantage of every right which the law secures to him, before his conviction should be made final. Amongst these rights, the person accused of the greatest crime known to the law has the right to have the solemn opinion of the judge who tried the cause, after a careful hearing of all that may be alleged against its justice, that it ought to stand.

The old and harsh, if not unjust, rule of the common law, which refused the right of a second trial to a person convicted of crime, either on account of mistakes made in the instructions of the trial judge, or when the evidence was conflicting or even insufficient, and which turned the accused over to the clemency, of the executive power as his only remedy when the court thought injustice had been done, has long ago been broken down in this country, and the right of the accused to demand a new trial for errors of the court on the trial, or where the conviction is not sustained by sufficient evidence, is firmly established, and in this state secured to the accused by the plain provision of the statute (section 4719, R. S. 1878); and the refusal of the trial judge to hear a motion for a new trial for misdirection of the judge, or because the verdict is against the clear weight of evidence, or is not sustained by sufficient evidence, is the denial of a right which tends to the promotion of justice, and ought not to be sanctioned except in cases where it is apparent from the record that there is no real foundation for the motion. Where the guilt of the accused is established by evidence which is overwhelming, this court might not consider it an error which would demand a reversal of the conviction,

that the trial judge refused to hear a motion for a new trial because the conviction was not sustained by the evidence; and in such a case the refusal to hear the motion would be taken as the opinion of the trial judge that the verdict ought to stand.

The record shows that, immediately upon the rendition of the verdict, one of the counsel for the accused notified the trial judge that he desired to move for a new trial on the judge's minutes, and requested the trial judge to give the counsel time to consult with his associate counsel and prepare the necessary motion papers, and requested said judge to hear such motion; that the judge replied that he could not remain more than one-half hour to hear such motion, and that, unless the counsel were ready with their motion within that time, he could not hear it; that, being unable to find his associate immediately, the counsel informed the judge that the motion papers could not be prepared within the half hour, and again requested said judge to remain and give the counsel an opportunity to prepare said papers and argue said motion. The judge replied that it was impossible for him to stay; that he was compelled to go back to his own circuit that day; that Judge H. S. Conger would be back at this court on Tuesday, the 22d day of October, 1878; and that Judge Conger would have to hear and decide the motion for a new trial; and thereupon he adjourned the court until the 22d of October, 1878.

In explanation of this state of affairs, it appears that the Hon. H. S. Conger, circuit judge of the twelfth circuit, had exchanged with the Hon. M. M. Cothren, circuit judge of the fifth circuit, and Judge Cothren had presided at the circuit court for Green county, in the twelfth circuit, upon the trial of the accused in this case, and, for reasons satisfactory to himself, undoubtedly, considered it impossible for him to stay to hear the motion for a new trial in the case, and supposed that it might properly be heard by the Hon. H. S. Conger on his return to his own court. In this we think the learned circuit judge erred. When a motion for a new trial is made upon the

minutes of the court, it is imperative that such motion should
be heard by the judge who tried the cause, unless the party
who makes the motion consents that it may be heard by some
other judge.   It would seem to be impossible for a judge to
intelligently determine a motion for a new trial upon the
minutes of the court unless he presided at the trial.   Without
being present at the trial, unless a bill of exceptions or case
were first settled or agreed upon, containing a full history of all
that took place, he could know nothing of the matters which
he ought to know in order to give an opinion as to whether a
new trial ought to be granted; and even upon a case or bill of
exceptions made and settled, he would not be in a position to
give a very satisfactory opinion upon the motion.   In that case he
would be very much in the position in which this court finds
itself when called upon, under our statute relating to appeals, to
review the opinion of the trial judge in granting or refusing
a new trial; and this court has repeatedly held that it must be
a case of very gross error which will induce this court to inter-
fere with the discretion of the trial judge in granting or refus-
ing a new trial upon the evidence, or for other matters oc-
curring during the trial.

The reason for this rule is so well stated by Chief Justice
Dixon, in *Lewellen v. Williams*, 14 Wis., 687–693, cited by me
in the opinion in *Jones v. Railway Co. (ante*, p. 352), that I
repeat it here as a better argument for the rule than I should be
able to make: " The exercise of a sound discretion in such
matters often depends upon a variety of facts and circum-
stances which cannot be described on paper and brought be-
fore the appellate tribunal with their original force and in-
fluence, and which no one but the judge before whom the case
was tried can fully and properly estimate.   Many of these
facts and circumstances are absolutely incapable of such de-
lineation; and to say that the discretion depending upon them
shall be transferred to another court, there to be exercised
without the means of forming a correct judgment, seems im-

possible." This argument is equally forcible when applied to the case of hearing a motion for a new trial upon the minutes of the court, when such motion is made before a judge who did not preside at the trial. The statute regulating the trial of civil actions expressly provides that "the judge before whom the issue is tried may in his discretion entertain a motion for a new trial on the minutes," etc. (section 2878, R. S. 1878), and excludes the right of any other judge to hear such motion. It would seem but just that the same rule should be applied to the motion when made in a criminal action.

The impropriety of turning over the hearing of this motion for a new trial upon the minutes of the court to another judge, who did not preside at the trial, is manifest, also, when the motion is in part founded upon erroneous rulings on the part of the presiding judge, either upon the introduction or rejection of evidence or in his instructions to the jury. The judge, in such case, who hears the motion, has no greater powers than the judge who presided at the trial, and no appellate jurisdiction to reverse his rulings. The respect he is bound to accord to the opinions of the judge who presided at the trial, would be very apt to prevent him from declaring that the presiding judge erred in his rulings or instructions. As is said above, the accused has the right to the deliberate judgment of the trial judge that the verdict is just and ought to stand, before he shall be concluded by it. Such is the rule in civil actions, and such is the rule in criminal actions in this state and all others where it is held that a new trial may be granted in such actions at the request of the defendant. The opinion of the trial judge is the opinion which is to prevail in such cases. The rule which prevailed in civil actions in the English courts when a motion for a new trial was made to the court in bank upon the ground that the verdict was against the evidence, was to take the opinion of the judge who presided at the trial; and if he was dissatisfied with the verdict, it was almost a matter of course to order a new trial.

We approve of the rule laid down by the circuit court of the United States for the third circuit, in the case of *United States v. Harding et al.*, 1 Wall. Jr., 137. In that case the defendants had been tried for murder before RANDALL, the district judge, then sitting for the circuit. Harding was found guilty of murder, and Green and Williams of manslaughter. Application was made, soon after the verdict, for a new trial, and was fully argued before Judge RANDALL, who, after the hearing, had formed and expressed to an officer of his court (as it was offered to be proved) his opinion on this application; but just as he was about to deliver his opinion, sudden illness arrested his design, and soon after terminated his life. The then circuit judge also died before any decision was given upon the motion. When the new judges were commissioned, the application for a new trial came on again to be argued on the same reasons which had been filed originally in the cause. Judges GRIER and KANE heard the argument, and Judge KANE delivered the opinion arrived at by both.

In the opinion Judge KANE says: "To my mind the principle of the law is clear: the defendant, before sentence can be pronounced on him, has a right to the judicial determination of his guilt by the court, as well as by the jury. If the verdict does not satisfy the conscience of the judge, the prisoner is entitled to a new trial. After the verdict is rendered, the judicial discretion is still in exercise, and at any time before the sentence is recorded it may modify the punishment if the statute has not made it specific, or set aside the conviction altogether. It does not need a motion on the part of the defense; the judge himself, at the very latest moment, may, *sua sponte*, award a new trial. . . . The prisoners here were entitled to the advantage of this judicial revision from the judge who sat upon the trial; and whether we will intend, *in favorem vitæ*, that he was disinclined to pronounce the capital sentence, or whether we content ourselves with an admission of the fact that the time in which this judicial dis-

cretion might be exerted had not yet expired,— we cannot affirm in either case that Judge RANDALL was content to enter judgment on this verdict. Even were we now satisfied what were his opinions at the time of his decease, we should be without just legal assurance that they might not have been modified by after reflection, and before the appropriate moment for recording them."

Further along in his opinion Judge KANE refers to the practice in the English courts in similar cases, and says: " I have found enough to satisfy me that where those courts are vested with a discretion as to their action on a verdict, that discretion is never exercised without unequivocal, direct judicial knowledge of the facts disclosed on the trial.   .   .   . At the common law, before the statutes of 11 Henry VI. c. 6, and 1 Edw. VI. c. 7, if a prisoner had been convicted before the commissioners of *oyer* and *terminer*, and a new commission issued before the award of execution, no judgment could be entered or execution ordered by their successors. 'And there was,' says Mr. Chitty, 'some reason for this restriction; for the subsequent judges were unacquainted with the circumstances of the case as developed on the trial, and might, therefore, unconsciously, be the occasion of injustice. In the case of *King v. Baker*, Carthew, 6, when there had been a conviction by verdict (of speaking seditious words), which was moved by *certiorari* into the King's Bench, it was said that that court never gives judgment on a conviction in another court, but the practice is, after issue joined in another court and the indictment removed, always to admit the party to waive the issue below and go to trial on an issue joined in this court;' and in that case the court directed a new trial, and Baker was found guilty by a second verdict."

Judge KANE also cites the case of *Warrain v. Smith*, 2 Bulstrode, 136, in the King's Bench, where it is said by COKE, chief justice, referring to the case of *Sutton's Hospital*, " that in the exchequer chamber, if one of the judges die pending

the argument, and another be appointed after the argument had, he shall not give his opinion in the case." The court, without attempting to review the evidence and proceedings on the trial before the deceased judges, ordered a new trial, solely on the ground that the prisoners had the right to have the opinion of the trial judges upon the question as to whether a new trial should have been granted, and that they had died before any opinion given upon the motion. Our statute for settling a bill of exceptions, in a case where the judge who tried the action dies or removes out of the state before the same is settled, is founded upon reasons similar in their nature to those urged for granting the new trial in the case above cited. It proceeds upon the ground that a party has the right to have his exceptions heard on appeal, and in order to preserve his exceptions on the trial he is entitled to have the presiding judge settle such exceptions, and no one else can. If, therefore, by the death or removal of the judge beyond the jurisdiction of the courts of this state, he cannot compel such judge to sign his exceptions, the court grants the party a new trial, upon his affidavit that his application is made in good faith and not for the purpose of delay, and upon his paying the costs of the opposite party on the first trial. Section 2877, R. S. 1878.

From an examination of the record in the case at bar, we cannot say there would have been any impropriety in granting a new trial to the accused. However powerful and conclusive of the defendant's guilt the evidence might have appeared to the jury, under the influences which were brought to bear upon them at the trial, as it appears to us, in the impersonal and undemonstrative written pages of the bill of exceptions, it does not impress the mind with a certainty of the guilt of the accused. Nor can we say that the learned circuit judge who presided at the trial of this case, had he heard the motion for a new trial after the hurry and excitement of the trial had passed, and when he could have reëxamined the

case in a more deliberate way than could well be done in the progress of the trial, would not, in view of the enormity of the crime of which the accused was found guilty, the fearful consequences which must follow such conviction if suffered to stand, and the nature of the evidence upon which it is founded, have come to the conclusion that the verdict ought not to stand.

But, without speculating on what the learned judge would or would not have done had he taken time to hear the motion, it is enough for us to know that he did not hear it, and that he refused to hear it, not because he thought the accused was not entitled to have it heard, but because his personal convenience would not permit him to hear it, and because, as we are bound to infer, he supposed it could with equal propriety be heard before the judge of the circuit in which the action was tried. We cannot believe that the learned circuit judge who presided at the trial of this action would have declined to give a calm and deliberate consideration to the defendant's motion for a new trial on account of any mere personal inconvenience to himself, had he not thought his rights would have been equally protected by presenting his motion to the presiding judge of the circuit. In this view of the case the learned judge was clearly mistaken. And because, by such mistake, the accused has been deprived of the deliberate judgment of the judge who presided at his trial, upon the question whether he ought to have had a new trial, the judgment of the circuit court must be reversed.

We do not deem it necessary to pass upon the other exceptions taken by the learned counsel for the appellant, and have not considered the exceptions to the instructions given by the learned judge with that care which we should deem it our duty to give them had it been necessary to pass upon their correctness. The fact that the accused made a motion for a new trial before the judge of the circuit in which the action was tried, but who did not preside at the trial, and that such motion was

made in part or in whole on the same grounds on which it was proposed to be made before the judge who presided at the trial, does not cure the error. The accused had done all he could do in order to get the motion heard before the proper judge, and was unable to get it so heard. Under these circumstances he had the right to make a motion for a new trial before the judge of the circuit, without waiving or curing the error which had been committed against him by the refusal of the presiding judge to hear the motion.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded for a new trial. The warden of the state prison will surrender the plaintiff in error to the sheriff of Green county, who will hold him in custody until he shall be discharged or his custody changed by due course of law.