## CY WILLIAMS *et al.* v. STATE.

No. A-2387—Opinion Filed July 21, 1919.

(182 Pac. 718.)

1. **CONSPIRACY—Information—Overt Act.** Under the statute (section 2234, Rev. Laws 1910), the crime of conspiracy to commit a felony or misdemeanor is not complete "unless some act besides such agreement be done to effect the object thereof, by one or more of the parties to such agreement," and, where a conspiracy to commit a crime is charged. it is necessary that the information contain, in addition to an allegation of the conspiracy to commit the particular crime, an allegation of some overt act or acts done in furtherance and pursuance thereof.

2. **VENUE—Conspiracy—Place of Overt Act.** Bill of Rights, section 20, gives the accused the right of trial by jury of the county wherein the crime shall have been committed. Our Code of Criminal Procedure (section 5612, Rev. Laws 1910), provides: "When a public offense is committed partly in one county and partly in another county, or the acts or effects thereof constituting or requisite to the offense, occur in two or more counties, the jurisdiction is in either county." Held that, in a prosecution for conspiracy to commit a crime. the overt act may be the sole basis of local jurisdiction.

3. **INDICTMENT AND INFORMATION—Jurisdiction—Allegations as to Conspiracy.** Where the jurisdiction of the court depends solely upon an overt act alleged in an information for conspiracy to commit a crime, it must be alleged with all the definiteness and certainty of any other jurisdictional fact, and the connection between the overt act and the conspiracy charged must be made to appear specifically by necessary allegations.

4. **CONSPIRACY—"Overt Act."** An "overt act" must be something more than evidence of the conspiracy. It must be an act done by one of the parties to carry out the intent. and it must be such as would naturally effect that result; at least, it must be a step towards the execution of the conspiracy.

5. **ABORTION—Pregnancy—Statute.** Under the statute (section 2436. Rev. Laws 1910), defining the crime of abortion. the pregnancy of the female is an essential element of the offense.

6. **VENUE—Conspiracy—Evidence of Overt Act.** The conspiracy alleged was to procure the crime of abortion and was entered into in Oklahoma county, and the alleged overt acts were committed in Greer county. The evidence showed that the defendants pro-

cured Maud Marshall, a woman not shown to be pregnant, to leave Oklahoma county and go to Greer county for the purpose of setting a trap by which one Dr. Border was to be induced to consent to perform an abortion on the woman, Maud Marshall, and to induce him to consent to perform an abortion one of the defendants informed Dr. Border that he would pay for the operation, and that the woman, Maud Marshall, was ready to receive advice to take some medicine or substance to procure a miscarriage, and they set up a dictagraph to take his advice.

Held that, in order to constitute the crime of abortion as defined by the statute, the woman, Maud Marshall, must have been pregnant at the time the alleged overt acts were committed in Greer county, and, there being no evidence of an overt act in furtherance of a conspiracy to procure an abortion having been committed in Greer county, the county court of Greer county did not have jurisdiction to receive the verdict or render the judgments appealed from.

*Appeal from County Court, Greer County;*
*H. M. Thacker, Judge.*

Cy Williams, B. V. Henson, R. A. Baird, C. P. Walker, and J. W. Chambers were jointly charged, tried, and convicted of conspiracy to commit the crime of abortion, and they appeal. Reversed.

Harry E. Stege testified that he was superintendent of the bureau of identification, police department, Tulsa, and had held the same position in Oklahoma City for two years and in Kansas City for seven years; was acquainted with the defendants C. P. Walker, Cy Williams, and B. V. Henson; that in the month of July, 1914, the defendant Walker asked him where he could get a dictagraph, and he told him he thought he could get one from the Burns Detective Agency, at Kansas City, for him to wire them, using his name, and say, "Charges guaranteed"; that Walker said he wanted the dictagraph to use on a job on the west side of the state; that a day or two later, at Oklahoma City, Walker told him that Mr. Henson of the Burns Agency was in Oklahoma City; that he met Henson, and talked with him about Walker and Cy Williams; that

Henson told him he had the dictagraph, but Walker had not yet deposited any money; that he told Henson not to worry about the money, it would be paid; that the defendant Walker had worked for the Lee Huckins Hotel as a detective, and Walker told him he was then working for John Keyes, who had a lot of electric light plants, street railways, ice plants, or something of that kind.

W. T. Perry, codefendant, against whom the case had been dismissed, testified substantially as follows:

That Cy Williams told him that there was a doctor in Western Oklahoma, mayor of his town, who was agitating the issuance of bonds for a municipal light plant at the place, and he wanted to get some dope on him; something that they could quiet him with and make him hold up on the bond issue. That he wanted to get some woman who was in the family way and have this doctor produce an abortion on her and have it so arranged that there would be witnesses to it, and then have it published on this doctor, and in that way kill him politically and professionally, and if they could do this that the State Medical Association would take his license from him. That on Sunday night before they left Oklahoma City on the following Tuesday, Williams told him he had everything fixed and the women were at the Cecil Hotel, in charge of Mrs. Mitchell. That he went to the Cecil Hotel and met these women, and the next day Williams told him to have the girls at the Frisco station that evening and they would leave on the 6 o'clock train for Chickasha. That Williams said he had given the expense money for the trip to the defendant R. A. Baird, and Williams would come over the next day. That he, with R. A. Baird, Maud Marshall, and Lola Fulson, went to Chickasha that evening, the 21st day of July, he thought it was. That the next day Williams came to

the hotel and told them to get ready to go to Hobart, saying he would get the tickets; that defendant Baird settled the hotel bill, and they left on the train. That after supper that evening at Hobart, Williams told him that a party would be there that night from Mangum and let him know whether or not he could get Dr. Border to come to Hobart, and that night about 12 o'clock he was standing with Williams in front of the hotel when an automobile stopped, and a man got out and asked if there was a man by the name of 'Williams from Oklahoma City there; Williams said, "Here I am," and this man and Williams walked back to the automobile.

That after talking awhile, Williams came back, and said, "These parties say they could not get Dr. Border to come to Hobart"; that he thought the defendant Chambers was the man that asked for Williams. The next morning Williams bought the tickets, and they all went to Altus. There he first met the defendant Henson and helped him to set up the dictagraph in the girls' room at the hotel. Then Williams came in with the girls and said he would send Baird to Mangum and arrange to have Dr. Border come to Altus that night. About midnight Williams said Baird had telephoned from Mangum that he could not get Dr. Border to come to Altus. The next morning the party left Altus and went to Mangum, stopping at the Harris House. The girls were assigned rooms 18 and 19. That they set up the dictagraph in room 19, and found that it worked all right. In about a half hour Williams came to the door of room 19 and said: "We have been tipped off. Take the dictagraph out of here." They took it down and put it in a suit case and took the suit case to Henson's room. In a half hour, about 10 o'clock, some one knocked on the door, and he opened it, and Dr. Border came in and said he had

an appointment with Mr. Baird to meet him there at that time and examine a young lady who was in trouble, and asked which one it was. Lola Fulson told him it was Maud Marshall. Dr. Border asked her if she was in the family way, and she said she was, and he asked her how far along, and she said about six weeks or two months, but that she did not want to be examined that night. Dr. Border walked out, and in a few minutes the officers came in and arrested them.

J. J. Long testified that he was proprietor of the Nash Hotel at Hobart; that Cy Williams registered from Oklahoma City at that time, and there were with him two other men and two women; that the defendant Baird was one of the party and registered by the name of "Pat Murphey."

Stansell Whiteside testified:

That he was court reporter of the Twenty-fifth judicial district. Was in Altus on the 25th day of July, and, in response to a telephone call from R. A. Baird, went to the hotel, and Baird introduced him to Cy Williams, who said he wanted to employ him to take a conversation over a dictagraph, and asked him to come back that evening, and that evening at 8 o'clock he went to the Orient Hotel, and Williams was talking to a man that he has known since as Perry. That Williams took him to his room and started to adjust the dictagraph, but could not get the ear piece right, and said, "I have an expert here with me." That he went out, and he came back with Mr. Henson. In about 30 minutes Williams appeared and said: "Well, the thing is off tonight. We will see you tomorrow." That he told Mr. Henson that he was official court reporter, and could not afford to get into anything illegitimate, and Henson pointed to the card on the dictagraph, and said:

"William J. Burns Dictagraph. You need not worry. It is perfectly legitimate. I don't know what these people are up to, but, so far as mine and your work is concerned, it is perfectly legitimate."

That he also asked Williams when he was talking to him, and Williams said, "It is perfectly legitimate." That the next day a party saying he was R. A. Baird called him on the telephone, and wanted him to come to Mangum, saying:

"These parties left Altus this morning unexpectedly. Just take the bus and come to the Harris Hotel."

That evening he went to Mangum, and the defendant Williams was sitting in front of the hotel when he arrived on the bus. That after supper he walked around the square and met Dr. Border, and talked to him a few minutes, and then returned to the hotel. Williams was in the lobby and told him to go to room 19. There defendant Henson asked him to help set up the dictagraph. They tried the machine, and it worked all right, and they sat down, and he said to Henson, "Is Dr. Border in this deal in any way?" and Henson did not answer, and he said:

"I suppose Dr. Border is onto the deal, whatever it is, for I met him here on the street and talked to him."

That Henson said, "Do you know him?" He said, "Yes." Henson said:

"You had better stay here in your room and not go out. They are liable to tumble onto this deal."

That Williams came in and said something, and Henson asked: "Who is the sheriff here? What kind of a fellow is he?" I said, "Hugh Tittle; he is all right, and will protect you in any legitimate proposition," and he said, "Well, the deal is all off." I said, "Mr. Henson, if it is all over,

you won't mind telling me what you were going to do." He said:

"You need not worry over the legitimacy of it. The State Medical Association has an idea there is some crooked medical work going on down here. There are some doctors down here producing abortions, and we just wanted to see if this fellow is doing any of it, or if this fellow would fall for it."

That he went to his room, and Dr. Border with a six-shooter in his hand and four or five deputy sheriffs appeared, searched him, and searched his grip.

C. A. Stubbs testified:

That he had been acquainted with the defendant J. W. Chambers several years. That he met him on the street in Mangum a few days before these parties arrived at the Harris Hotel, and Chambers said:

"Dr. Border is butting into everybody's business. He is fighting the light plant people. He is fighting these doctors. But there was a bunch after him now that would get him, and it would not be long before they would."

That Chambers was manager of the Mangum Electric Light Company.

Dr. G. F. Border testified:

That he was a physician and surgeon, county health officer, and mayor of the city of Mangum, that he had known defendant Chambers at Mangum six or seven years. That the defendant C. F. Walker was, as he understood it, secretary of the Mangum Electric Light Company. That the defendant Baird called him on the telephone about a week before these defendants appeared at Mangum, and stated that he was at the Lee Huckins Hotel at Oklahoma City, and asked him to come to Oklahoma City that night.

That he had a surgical case he wanted him to operate upon, and he told Baird that he was very busy, and if he had a surgical case the proper place for that was in the hospital, and Baird said he would report to him later. That a few days later Baird came to his hospital in Mangum and told him the patient that he wanted him to see at the Lee Huckins Hotel was now at Altus, and he offered him $50 to go there and perform an abortion. That the girl's name was Maud Marshall, and he refused to go to Altus with him. That the next morning Baird again appeared at the hospital and told him that he had arranged for these people to come to Mangum, and they would be at the Harris Hotel, and wanted the operation performed there that night at 11 o'clock. He said she was a poor girl and it was a charity case; that he had been a minister of the gospel and knew what sympathy was for a girl; that this girl had some single sisters that she had to care for and their reputation would be ruined; that he had devoted his time to charity work and doing good for others, and he would pay $50 for the operation.

That night he went to the Harris Hotel and inquired for Baird, and he came down in the lobby, and he asked Baird if he was ready, and Baird said: "No, I am uneasy. There are some officers about this place. We want to be careful." He said to Baird, "Let's go out and see what they are doing now," and they walked out, and he told the officers to take charge of Baird and put him in jail. That he then went to the room where the other parties were supposed to be, and in the room was Maud Marshall, Lola Fulson, and W. T. Perry. That he asked which was Maud Marshall, and a girl lying on the bed said she was Maud Marshall, and he asked her, "Are you pregnant?" and she said, "Yes, sir," and he told her, "I am the doctor that

was to operate on you," and she said, "I am not ready. I have decided to put that off until in the morning." That he left the room and noticed the officers in the hall, that he had stationed there for the purpose of arresting those parties. That he had a gun in his hand and met Stansel Whiteside, pointed it at him, and asked him what he was doing there, then entered the other room and held his gun on Cy Williams and Henson and told them to put their hands up, and told the officers to search them and arrest them. That they took a couple of pistols from them and found the dictagraph in the suit case. That at the time a bond issue was pending in the city of Mangum for the purpose of building a municipal light plant and an ice plant also, and as mayor of the town he was advocating the bond issue, and the Mangum Electric Light Company was taking an active part in opposing the voting of the bonds.

Myrtle Lucile Mitchell testified:

That she resided at Oklahoma City. Was acquainted with defendant Cy Williams, met him on the street there, and he said:

"We have some work, and we can make a barrel of money. I want you to get a girl that is pregnant to go over and catch an old doctor in the western part of the state that is an abortionist."

That she said, "that looks crooked to me," and he said:

"It is perfectly legitimate. Those furnishing the money want to get him out of the country."

That she walked down the street and met Lola Fulson, and she said:

"Maud Marshall is down at Purcell, and she is that way, and would be awful glad to get rid of it."

8—16

That the next morning Lola Fulson called her and said, "Maud Marshall is here," and she went and met them and went with the girl to a lawyer's office to meet Cy Williams, and there she introduced the girls to him. He asked Maud Marshall if she was pregnant, and she said she was, and he said they were going to get that doctor to come there; that he was in the city that day, and they would get him and pull this off at Oklahoma City. That later Williams told her they would have to go out of town to do this work and would have to go to Kansas City for a dictagraph, and she told him that Mr. Stege at Tulsa had one. That Williams told her he would give her $500 and give the girls a hundred each. That the next time she phoned the girls they were gone.

The state rested, and counsel for the defendants and each of them moved the court to instruct the jury to return a verdict of not guilty, for the reason that the testimony adduced by the state fails to establish or prove the allegations of the information, which motions were overruled, and exceptions allowed.

For the defense Maud Marshall testified:

That she was in Mangum, at the Harris Hotel, on July 25, 1914, and was there arrested with the other parties connected with the case. That she was not pregnant in the month of July, 1914. That Dr. Border came to the room where she and Lola Fulson and Mr. Perry were, and said, "I want to see Miss Maud Marshall. Mr. Baird sent me here to see her." That she said to him: "I can't see you now. I will see you later." That she did not say to him there that she was pregnant and so many weeks gone. She was then asked if her monthly sickness came on while she was in the county jail at Mangum. Counsel

for the state objected on the ground "that it was immaterial whether this woman was pregnant or not." The court sustained this objection. That she knew the witness Mrs. Mitchell, but not by that name. That she did not tell Mrs. Mitchell prior to the 25th day of July, 1914, that she was pregnant, and that she did not agree or consent at any time to have an operation performed on her.

Cross-examined, she stated that her age was 22 years; that she came to Mangum with Mr. Williams, Mr. Baird, Mr. Perry, and Miss Fulson; that they wanted her to come there to have Dr. Border perform an operation; that they did not' explain to her exactly how it was, but said she would know when she got there; that a day or two after her arrest she told the county attorney and Mr. Pruiett, in the presence of Mr. Daws, that she was not in the family way; that she was not at any time in the family way.

Lola Fulson testified:

That she was present with Maud Marshall and Mr. Perry when Dr. Border came to their room in the Harris Hotel. That Dr. Border said he called to see Maud Marshall. She did not remember what was said, but she knew that Maud Marshall was not pregnant and stated the reasons. That, as she understood it, they were there to see Dr. Border, and that Dr. Border was to make an examination and consent to perform an abortion, and they were to catch him and show him up.

The foregoing is a substantial statement of the evidence in the case.

*Ben F. Williams* and *Burwell, Crockett & Johnson,* for plaintiffs in error Henson, Walker, and Chambers.

*Ben F. Williams,* for other plaintiffs in error.

The Attorney General and *R. McMillan* and *W. C. Hall*, Asst. Attys. Gen., and *A. R. Garrett*, County Atty., for the State.

DOYLE, P. J. (after stating the facts as above). The information in the case charged:

"That heretofore, to wit, on or about the 25th day of July, 1914, in the county of Greer, state of Oklahoma, Cy Williams, B. V. Henson, R. A. Baird, C. P. Walker, Maud Marshall, Lola Fulson, J. W. Chambers and W. T. Perry, did then and there unlawfully, willfully and feloniously, conspire, agree and confederate together to commit the crime of procuring the miscarriage of a pregnant woman, said miscarriage not being necessary to preserve the life of said pregnant woman, and in furtherance, and in pursuant of said agreement, they procured Maud Marshall, a woman, whom they believed to be pregnant, to leave Oklahoma City, in the state of Oklahoma, and come to Mangum, in the county of Greer, state of Oklahoma, and secured rooms at the Harris Hotel, and had the said Maud Marshall placed therein for the purpose and with the intent of having a physician to advise said Maud Marshall to take medicine, drug or substance or submit to the use of some instrument to effect a miscarriage on the said Maud Marshall, said miscarriage not being necessary to preserve the life of said Maud Marshall; and in furtherance of said agreement and conspiracy they secured the service of G. F. Border, a physician and surgeon residing in said city of Mangum, to advise said Maud Marshall to take some medicine, drug or substance, or submit to the use of some instrument to effect said miscarriage and produce the same; and in furtherance of said agreement and conspiracy the defendants secured rooms at the Harris Hotel in said city of Mangum and had said Maud Marshall placed in said rooms and informed the said G. F. Border that the said Maud Marshall was ready to receive said advice or to have said instrument used in procuring said miscarriage.

"And the defendants did then and there, in the manner and form as aforesaid, unlawfully, willfully and feloniously commit the crime of conspiracy as defined in the first subdivision of section 2232 of the Revised Laws of Oklahoma of 1910, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the state."

A demurrer to the information on the ground that it did not state facts sufficient to constitute a public offense was duly filed, overruled, and exception allowed.

On motion of the county attorney, the case against W. T. Perry, Lola Fulson, and Maud Marshall was dismissed.

Upon the trial the verdict of the jury was as follows:

"We, the jury impaneled and sworn to try the issues in the above-entitled cause, do, upon our oaths, find the following defendants: Cy Williams, B. V. Henson, R. T. Baird, C. P. Walker, and J. W. Chambers—guilty, and leave their punishment to be fixed by the court."

Motions for new trial and in arrest of judgment were duly filed, and overruled, and the court sentenced each of the said defendants to be confined in the county jail for five months and to pay a fine of $500.

To reverse the judgments rendered on verdict, an appeal was duly perfected.

Various errors are assigned upon the record, and the questions presented have been ably and elaborately argued by counsel on both sides, both orally and in the briefs. However, it is neither important nor necessary to consider more than one or two of the questions presented. Counsel for plaintiffs in error contend that the information is insufficient to charge a conspiracy to commit the crime of

abortion, in that it fails to allege that the woman therein named was pregnant. It is further contended that the conspiracy alleged in the information was not proved, in that there was no evidence of overt acts in pursuance of and to effect the object of the conspiracy. In this connection, while the question of jurisdiction was not challenged in the trial court, the question is raised in this court. The following are the provisions of the Penal Code upon which the information was based:

Section 2232, Rev. Laws 1910:

"If two or more persons conspire, either: First, to commit any crime; or, second, falsely and maliciously to indict another for any crime, or to procure another to be charged or arrested for any crime; or, third, falsely to move or maintain any suit, action or proceeding; or, fourth, to cheat and defraud any person of any property by any means which are in themselves criminal, or by any means which, if executed, would amount to a cheat, or to obtaining money or property by false pretenses; or, fifth, to commit any act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of justice or the due administration of the laws—they are guilty of a misdemeanor."

Section 2234, Rev. Laws 1910:

"No agreement to commit a felony or to commit a misdemeanor amounts to a conspiracy, unless some act besides such agreement be done to effect the object thereof, by one or more of the parties to such agreement."

Section 2436, Rev. Laws 1910:

"Any person who administers to any pregnant woman, or who prescribes for any such woman, or advises or procures any such woman to take any medicine, drug or substance, or uses or employs any instrument, or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve

her life, is punishable by imprisonment in the penitentiary not exceeding three years, or in a county jail not exceeding one year."

It is averred in the information that it charges a "conspiracy" as defined by the first subdivision of section 2232, *supra*, and the case was entirely regarded in the court below and was tried and submitted upon the theory that the information charged only a conspiracy to procure an abortion on the particular female therein named. The information charges that the defendants did "conspire, agree and confederate together to commit the crime of procuring a miscarriage of a pregnant woman, said miscarriage not being necessary to preserve the life of said pregnant woman." The record shows that the court refused instructions requested by the defendants to the effect that the jury must find that the woman, Maud Marshall, was a pregnant woman before they would be warranted in convicting them, and that the court sustained objections to evidence offered showing or tending to show that the woman, Maud Marshall, was not at any time pregnant, on the theory that it was immaterial as to whether or not she was in fact pregnant.

To sustain the verdict and judgments of conviction, the state relies upon the case of *Queen v. Whitchurch et al.*, as reported in 8 Am. Crim. Rep. 1. The *Whitechurch Case* was an indictment charging a woman who was not in fact with child with conspiring with others, all believing her to be pregnant, to procure an abortion on herself. The court held the prosecution would lie. The statute upon which the prosecution was based appears in the official report. 24 Q. B. D. 420. The language of the English statute is:

"Whosoever with intent to procure a miscarriage of any woman, whether she be or not with child, shall unlawfully administer to her or cause to be taken by her any poison or other noxious thing, or shall unlawfully use any instrument or other means whatsoever with the like intent, shall be guilty of a felony."

The Dominion of Canada and the states of Massachusetts, Maryland, Florida, and Iowa have enacted statutes similar to the English statute.

Under section 2436, *supra,* the pregnancy of the female is an essential element of the offense. It follows that the doctrine of the *Whitchurch Case* is not in point, and decisions based on similar statutes have no application to the instant case.

As to the position that the county court of Greer county was without jurisdiction, the defendants by their counsel in their argument say:

"Assuming for the purpose of argument only that the information and evidence may be held sufficient to show a conspiracy to produce an abortion, we contend that there is an entire lack of evidence of any overt act in Greer county under any theory of the case, and clearly an overt act in Greer county would be necessary to confer jurisdiction on the county court of that county."

Under the statute, section 2234, *supra,* the crime of conspiracy to commit a felony or misdemeanor is not complete "unless some act besides such agreement be done to effect the object thereof, by one or more of the parties to such agreement," and, where a conspiracy to commit a crime is charged, it is necessary that the information contain, in addition to an allegation of the conspiracy to commit the particular crime, an allegation of some overt act or acts done in furtherance and pursuance thereof. It will

be observed that the statute making the overt act an essential element of the crime does not apply to all conspiracies, but only to those which have for their object the commission of a crime.

The uncontroverted evidence is that the conspiracy was formed and entered into in Oklahoma county and the alleged overt acts were committed in Greer county. It is well settled that a prosecution for conspiracy to commit a crime may be had in any jurisdiction wherein an overt act in pursuance of the conspiracy is committed. The rule rests on the reason that each overt act is deemed a renewal of the conspiracy. Thus in *People v. Mather*, 4 Wend. 231, 24 Am. Dec. 122, it was said:

"The law considers that, wherever they act, there they renew, or, perhaps, to speak more properly, they continue their agreement, and this agreement is renewed or continued as to all whenever any one of them does an act in furtherance of their common design."

And see *Hyde v. U. S.*, 225 U. S. 347, 32 Sup. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614.

The question is whether the overt acts alleged and the proof thereof were sufficient to give the county court of Greer county jurisdiction.

The constitutional guaranty gives the accused the right of trial by jury of the county wherein the crime shall have been committed (Bill of Rights, sec. 20), and our Code of Criminal Procedure provides that—

"When a public offense is committed, partly in one county and partly in another county, or the acts or effects thereof constituting or requisite to the offense, occur in two or more counties, the jurisdiction is in either county." Section 5612, Rev. Laws 1910.

Under the statute (section 2234, Rev. Laws), the crime of conspiracy is not complete without the commission of an overt act. Therefore the overt act may be the sole basis of local jurisdiction. However, it must be something more than evidence of the conspiracy. It must be an act to effect its object.

The overt acts alleged are that the defendants "procured Maud Marshall, a woman whom they believed to be pregnant, to leave Oklahoma City and come to Mangum, in the county of Greer, and there secured rooms and had the said Maud Marshall placed therein for the purpose and with the intent to have a physician to advise said Maud Marshall to take medicine, drug, or substance, or submit to the use of some instrument to effect a miscarriage on the said Maud Marshall," and in furtherance of said conspiracy "secured the service of G. F. Border, a physician and surgeon residing in the said city of Mangum, to advise the said Maud Marshall to take medicine, drug 'or substance, or submit to the use of some instrument to effect the said miscarriage and produce the same, and informed the said G. F. Border the said Maud Marshall was ready to receive said advice or to have said instrument used to produce said miscarriage."

Nowhere in the information is it alleged that the woman, Maud Marshall, was in fact pregnant, and there was no competent testimony tending to show that the defendants had reason to believe or did believe at the time that the woman, Maud Marshall, was pregnant.

An "overt act" is one done to carry out the intent, and it must be such as would naturally effect that result. Whether a certain act was in pursuance of the conspiracy depends entirely upon what the conspiracy was, and upon whether the parties conspired to accomplish their purpose

by the means alleged. Where a conspiracy to commit a crime is established, any act in pursuance of the conspiracy and to effect its object is sufficient to give the court jurisdiction in the county where the act was committed. It is said that a conspiracy to commit a particular crime is essentially of the nature of an attempt to commit the crime.

Bishop says:

"We have already seen, in a general way, that to a certain extent conspiracy is a species of attempt. And—

"The act of conspiring, and the specific intent to accomplish what constitutes a substantive crime, and in combination a criminal attempt, and it is the professional usage to term it conspiracy. It follows the same rules, and is subject to the same limitations, as other attempts."

2 Bishop's New Crim. Law, sec. 191.

Wharton says:

"Conspiracy, when its object is to effect an indictable offense, is subject in the main to the limitations heretofore expressed with regard to attempts." 2 Wharton, Crim. Law (11th Ed.) sec. 1605.

And again:

"The only safe course is to make the test objective, even and palpable, and to apply universally the limit here presented, holding that conspiracy does not lie unless the defendants can be proved to have done something which, if not interrupted by extraordinarily natural occurrences or by collateral human intervention, would have resulted in an unlawful act." Wharton, Crim. Law (11th Ed.) sec. 1603.

An attempt to commit a crime can only be made under circumstances which, had the attempt succeeded, would have constituted the substantive offense.

"By the weight of authority, if, as a matter of law, the completed act accomplished as intended would not be a crime, the attempt to commit it is not criminal, whatever

may be the party's state of mind. For example, it is not a crime at common law to procure an abortion with the consent of the woman, where she is not quick with child; and therefore an attempt to procure an abortion under such circumstances is not indictable, though the party may not know that the child has not been quickened." Clark and Marshall, Criminal Law (2d Ed.) p. 190.

The conspiracy alleged was to procure the crime of abortion. In order to constitute the crime of "abortion" as defined by the statute, the woman, Maud Marshall, must have been pregnant at the time the alleged overt acts were committed in Greer county.

Where the statute makes pregnancy an essential element of the offense, it must be alleged and proved, and, where the jurisdiction of the court depends solely on an overt act alleged in the information for conspiracy to commit a crime, it must be alleged with all the definiteness and certainty of any other jurisdictional fact, and the connection between the overt act and the conspiracy charged must be made to appear specifically by necessary recitals. 12 C. J. 625.

Considered in connection with the proof, the information is defective in failing to allege that the woman, Maud Marshall, was at the time pregnant.

The evidence showed the conspiracy was entered upon in Oklahoma City; that the defendants procured Maud Marshall, a woman not shown to be pregnant, to leave Oklahoma county and go to Greer county with several of the defendants, for the purpose of setting a trap by which Dr. G. F. Border was to be induced to consent to perform an abortion on the woman, Maud Marshall; that there, to induce him to agree to perform an abortion, one of the defendants informed Dr. Border that he would pay for the

operation, and that the woman, Maud Marshall, was ready to receive advice to take some medicine or substance to procure a miscarriage, and they set up a dictagraph to take his advice.

There is no conflict in the evidence with respect to what the defendants did in Greer county, and there is no evidence to show their intent was to have an abortion performed. The evidence showed their purpose was to induce Dr. Border to advise the woman, Maud Marshall, to take some medicine or drug to procure a miscarriage; the object of the defendants being thereby to injure his character and standing professionally and politically.

Our Code of Criminal Procedure provides:

"Upon a trial for conspiracy, in a case where an overt act is necessary to constitute the offense, the defendant cannot be convicted unless one or more overt acts be expressly alleged in the indictment or information, nor unless one or more of the acts alleged be proved; but any other overt act, not alleged in the indictment may be given in evidence." Section 5883, Rev. Laws 1910.

There being no evidence of an overt act in furtherance of a conspiracy to procure an abortion having been committed in Greer county, it follows that the county court of Greer county did not have jurisdiction to render the judgments appealed from.

The judgments herein are therefore reversed.

ARMSTRONG, J., concurs.

MATSON, J., disqualified and not participating.