PARKE, Plaintiff in error, vs. THE STATE, Defendant in error.

*March 14—April 7, 1931.*

For the plaintiff in error the cause was submitted on the brief of *Hill, Beckwith & Harrington* of Madison.

For the defendant in error there was a brief by *William M. Gleiss*, district attorney of Monroe county, the *Attorney General*, and *J. E. Messerschmidt*, assistant attorney general, and oral argument by *Mr. Gleiss* and *Mr. Messerschmidt*.

NELSON, J.   The defendant was convicted of the crime of manslaughter in the second degree and duly sentenced

to the state prison pursuant to the provisions of secs. 340.16 and 340.17 of the Statutes. The information substantially charged that the defendant feloniously performed an abortion operation upon Dorothy Schultz on the 19th day of June, 1929, which produced her death on the 3d day of July, 1929, at the county of Monroe in the state of Wisconsin.

The defendant earnestly contends that the evidence adduced upon the trial was insufficient to prove the defendant guilty beyond a reasonable doubt of the crime charged.

The defendant has the right to have his guilt determined by the court as well as by the jury. He has the right to have "the solemn opinion of the judge who tried the cause, after a careful hearing of all that may be alleged against its justice, that it ought to stand." *Ohms v. State,* 49 Wis. 415, 5 N. W. 827. He also has "the right, upon writ of error, . . . to demand the deliberate opinion and judgment of this court upon the question whether his guilt was sufficiently proven." *Lonergan v. State,* 111 Wis. 453, 456, 87 N. W. 455; *Gerke v. State,* 151 Wis. 495, 496, 139 N. W. 404; *Hamilton v. State,* 171 Wis. 203, 209, 176 N. W. 773; *Manna v. State,* 179 Wis. 384, 392, 192 N. W. 160; *Eckman v. State,* 191 Wis. 63, 86, 209 N. W. 715; *Cobb v. State,* 191 Wis. 652, 664, 211 N. W. 785.

This right of a defendant who has been convicted of a crime, after due and proper trial, is clearly established. This right, however, is to the solemn and deliberate judgment of this court and each member thereof, on the question whether his guilt *was* sufficiently proven. In other words, he has the right to demand of this court its solemn and deliberate judgment on the question whether there was adduced upon his trial evidence which, if believed by the jury and rationally considered, was sufficient to prove his guilt beyond a reasonable doubt. This is the extent of this right and the extent of our solemn duty. A defendant has no right to

demand that this court and every member thereof be affirmatively convinced of his guilt beyond a reasonable doubt. An appellate court cannot, for obvious reasons, properly function as a trial court or as a jury. When there is a conflict of evidence the weight thereof is for the determination of the jury. As was recently said in *State v. Hintz,* 200 Wis. 636, 641, 229 N. W. 54, "the power of the court to disturb the finding of the jury ends with the discovery of evidence to sustain the verdict. In the interest of exactness it should perhaps be stated that this rule is subject to two qualifications: one is where the finding of the jury is contrary to established physical facts, and the other is where it is contrary to all of the reasonable probabilities. . . . No rule is more thoroughly established by the decisions of this court than that where conflicting inferences may be drawn from the facts proved, the question is one for the jury. . . . Whatever doubts we may entertain concerning the justice of this verdict, our power to disturb it is limited by established rules of jurisprudence designed to protect the sanctity of findings of fact, a function which constituted society has committed to the jury."

This court, however, may, when it has great doubt as to the justice of a judgment of conviction or when it seems probable that justice has miscarried by the verdict rendered, order a new trial. Sec. 251.09, Stats.; *Paladino v. State,* 187 Wis. 605, 205 N. W. 320; *State v. Hintz,* 200 Wis. 636, 229 N. W. 54. This brief discussion has been indulged in at the outset for the purpose of making clear the rights of a defendant convicted of crime and the solemn duty of this court in reviewing criminal cases. In the light of the foregoing law we may now proceed to discuss the contentions of the defendant in connection with the evidence.

The defendant contends that in order to maintain a prosecution under sec. 340.16, involving the death of a woman, the State must prove beyond a reasonable doubt that the

deceased was pregnant. As to this contention there cannot be the slightest doubt. Pregnancy is clearly an element of the offense defined by sec. 340.16 and by similar statutes of other states. *People v. Richardson,* 161 Cal. 552, 120 Pac. 20; *People v. Patrick,* 277 Ill. 210, 115 N. E. 390; *State v. Stafford,* 145 Iowa, 285, 123 N. W. 167; *Dixon v. State,* 46 Neb. 298, 64 N. W. 961; *Williams v. State,* 16 Okla. Crim. Rep. 217, 182 Pac. 718. Many other cases to the same effect can be cited.

The defendant's principal contention is that the State failed to prove beyond a reasonable doubt that Dorothy Schultz, the deceased, was pregnant. This contention necessitates a review of the evidence adduced by the State and which the State claims fully supports the verdict. In June, 1929, Dorothy Schultz was just past nineteen years of age. She resided with her parents at Tomah, Wisconsin. She had just graduated from high school and was about to take a government position in Washington. Two or three weeks before June 16th she had told her mother that she was pregnant, having missed two menstrual periods. On June 14th she was examined by Dr. Winter of Tomah for the purpose of determining whether she was pregnant. Dr. Winter was of the opinion that she was in that condition. Shortly thereafter, on June 15th or 16th, she was taken by her mother to the defendant at Camp Douglas for the purpose of making arrangements with the defendant to perform an abortion operation upon her. The defendant at that time examined her and expressed the opinion that she was pregnant. He agreed to help her out of her scrape for the sum of $150 cash. The sum demanded seemed excessive to the mother, but, on being assured by the defendant that he knew his business and that that was his regular charge, the mother agreed to procure the amount demanded and to bring it to the defendant when Dorothy was brought back

again. It was arranged that Dorothy should return to the home of the defendant in the immediate future, but, due to the inclemency of the weather, Dorothy was not brought back to the defendant's home until the 19th of June. At that time the mother requested permission of the defendant to stay at his home while Dorothy remained there, but the defendant objected to the mother's staying there. The mother then suggested that she would like to stay at some hotel at Camp Douglas while Dorothy was being treated by the defendant, but the defendant likewise objected to this suggestion. On the 19th of June the defendant assured the parents that everything would be all right; that he would perform the operation in the morning. The parents thereupon paid to the defendant the sum of $150 in bills. At this time Dorothy appeared to be in good health although about two weeks before this time she had had a sore throat. The next day, June 20th, the mother went to Camp Douglas and brought Dorothy home. She was apparently feeling pretty well, but went to bed and later on in the evening experienced a rather severe chill. A few days after June 20th the defendant was notified of the unfavorable condition of Dorothy and thereupon came to the Schultz home. He brought certain instruments with him. After thoroughly sterilizing them by boiling, he strapped Dorothy down and "cleaned her out." The treatment given Dorothy by the defendant and her symptoms, which need not be set forth in this opinion, were consistent with the claim of the State that an abortion had theretofore been performed upon her. The defendant visited her on at least two other occasions. The defendant visited the deceased on June 25th and found her in an exceedingly serious condition. Her condition was apparently so serious that he considered it wise to go back to Camp Douglas and procure other medicine. It was suggested at that time that another doctor be called in, but the

defendant admonished the members of the family not to get any other doctor under any consideration until he returned. However, during the defendant's absence, Dr. Winter of Tomah was called in. He found Dorothy to be in a delirious condition with a temperature of 105. Dr. Winter observed symptoms and conditions which led him to believe that she had experienced an abortion. After several days the condition first found by Dr. Winter improved and Dorothy became very ill with a very well defined case of pneumonia, from which she died on July 3, 1929. Some time after the defendant and Dr. Winter had met at the Schultz home on the 25th of June, the defendant called at Dr. Winter's home and made inquiry as to Dorothy's condition. At that time, according to the testimony of Dr. Winter, the defendant said that he did not see why or how there could be any infection in the case because he had been very careful and sterile in his work. After Dorothy's death an autopsy was conducted on her body by Dr. Winter of Tomah and Dr. Beebe of Sparta. They found, among other things, that her uterus was enlarged, her cervix stretched, and other evidence of recent pregnancy. In the opinion of these doctors the condition found indicated that some type of mechanical abortion had taken place. They also found evidence of infection. The uterus and adnexa, together with samples of the vital organs of Dorothy Schultz, were placed in containers and conveyed to Dr. McGary, a pathologist of the Wisconsin General Hospital. Dr. McGary examined the organs and specimens in gross and also made numerous specimen slides therefrom so that the several tissues might be microscopically examined. Dr. McGary testified at length upon the trial, but it is unnecessary to review his testimony beyond stating that he found the uterus examined greatly enlarged and the uterine cavity filled with necrotic material. Basing his opinion upon his examination in gross of the organs and of the microscopic slides made therefrom, he

testified that it was his opinion that the uterus had recently been pregnant. His opinion, based largely upon the enlarged uterus, the dilated cervix, the appearance of the adnexa, the finding of retained secundi in the uterus, and the finding of "bacterial blocks" in the uterus, indicating septicemia, was that her death was caused by septic bronchial pneumonia resulting from abortion. Dr. Stoval of the Wisconsin General Hospital, who examined the slides prepared by Dr. McGary, corroborated the findings and testimony of Dr. McGary. Dr. Flynn of La Crosse testified in answer to a hypothetical question that in his opinion the infection in the lungs could have been carried through the blood stream from the infected uterus.

Some time after the death of Dorothy the defendant came to the home of her parents and expressed his sympathy and his desire, under all the circumstances, to give back to the parents the amount of money which they had given to him and to pay them something in addition. The sum of $150 was paid to Dorothy's parents and a few days later the defendant paid to them an additional sum of $850. This in brief is a statement of the evidence relied upon by the State to sustain the conviction.

The defendant himself took the stand and testified at length, admitting many of the circumstances testified to by the parents of Dorothy Schultz, but at the same time making explanation for the purpose of destroying their harmful effect. He testified among other things that the first visit of Dorothy and her mother at his office was about June 8th. That at that time he made no examination of Dorothy, but admitted that he agreed to examine her for the purpose of determining whether she was pregnant and whether her physical condition was such that she could safely go through a childbirth. He explained that his charge of $150 in advance was made because Mr. and Mrs. Schultz were strangers to him and because he might have to make blood

tests and might be required to obtain the hospitalization of Dorothy and the opinion of other physicians in order to determine her condition and whether she was physically able to go through the ordeal of childbirth. However, after Dorothy stayed at his home for about a day he permitted her to return to her home without having made any tests and he did not return any part of the $150 at that time. The defendant further testified that when Dorothy was brought to his home on the 19th of June she herself had already attempted to produce a miscarriage. He testified that the treatment which he gave to her on the 19th and 20th days of June was in accordance with the treatments given to patients by the best and most competent practitioners under similar circumstances. Two able and eminent physicians testified, assuming the conditions found by the defendant and the treatment given the patient were true, that the particular treatment claimed to have been given by the defendant was in accordance with the best medical practice. Dr. Bentzien of Milwaukee made an examination of the organs and samples theretofore examined by Dr. McGary. He made several microscopic slides. The results of his examinations in gross and of his microscopic investigations directly contradicted the testimony of Drs. McGary and Stoval and Drs. Winter and Beebe. He found no evidence of pregnancy and no "bacterial blocks" in the uterus. Dr. Fernan-Nunez also testified on behalf of the defendant, basing his conclusions largely upon a study of a single microscopic slide made of tissue taken from the uterus submitted to him. He corroborated Dr. Bentzien as to finding no tissue evidencing pregnancy or evidencing infection. Both Drs. Bentzien and Fernan-Nunez testified to an examination of the uterus and their failure to find any evidence of a "corpus luteum." The corpus luteum is a cavity in the ovary which remains after the ovum is forced out at the menstrual period. The cavity fills with blood and, in

case of the impregnation of the ovum, develops and enlarges during the first three months of pregnancy. It is claimed by the defendant that the absence of the corpus luteum constitutes physical proof of the absence of pregnancy.

This statement of the main facts proven is probably sufficient, although concededly not complete, to show the main issues upon which the jury had to pass. The weight of this evidence was for the jury. While much of the evidence was of a technical nature and involved the use of medical terms, we have no doubt that the jury understood the testimony and its effect as well as such testimony can ever be understood by lay persons.

The record reveals that the learned trial court, with his characteristic calmness and fairness, asked many questions throughout the trial which were well calculated to bring about as complete an understanding of the testimony as is possible in a jury trial.

After a careful review of all of the evidence and bearing in mind the defendant's right to demand the deliberate opinion and solemn judgment of this court on the question whether his guilt was sufficiently proven, it is the deliberate opinion of this court and each member thereof that the evidence was sufficient to prove the defendant's guilt beyond a reasonable doubt. There is nothing in the record which produces in our minds a great doubt as to the justice of the judgment of conviction herein, or which gives rise to a feeling that justice has miscarried. Because of these careful and deliberate conclusions which we have arrived at, the judgment must be affirmed.

*By the Court.*—Judgment affirmed.