BRADLEY, Plaintiff in error, vs. THE STATE, Defendant in
error.

*February 4—February 22, 1910.*

*Criminal law: Instructions to jury: Oral request: Review: Homicide:
Degrees: Heat of passion: Self-defense: Evidence: Quarrelsome
disposition.*

1. The accused cannot, as a matter of strict legal right, predicate
error upon the refusal of the trial court to instruct the jury as
orally requested; but the supreme court may, in its discretion,
consider the point as raised.

2. Sec. 4354, Stats. (1898),—providing that any person who shall
kill another in the heat of passion without a design to effect
death, by a dangerous weapon, in any case except such wherein
the killing of another is declared to be justifiable or excusable,
shall be deemed guilty of manslaughter in the third degree,—
does not apply to a case where the accused justifies the homi-
cide as one committed in self-defense.

3. An instruction to the effect that the law limits the right of self-
defense to necessity as it reasonably appears to the defendant at
the time, and that in acting upon appearances and in taking the
life of his fellowman a person acts at his peril and will not be
excused unless the circumstances proven were such as would
reasonably cause him to believe his act necessary to save his
own life or to save himself from great personal injury, was ap-
propriate to this case and not erroneous.

4. So, also, upon the evidence in this case it was proper to instruct
that if defendant was in fault in creating the situation of dan-
ger his right of self-defense did not arise until he had done all
he could reasonably do to avoid the necessity of killing the de-
ceased in order to protect himself.

5. Evidence that a short time before the killing, while a group of
fellow workmen, including the accused and the deceased, were
returning to their boarding house, the accused was the aggres-
sor in a quarrel with another member of the party and knocked
him down with one hand while holding a revolver in the other,
was competent to show the quarrelsome and homicidal disposi-
tion of the accused, nearly up to the time of the homicide, toward
his workmates.

ERROR to review a judgment of the circuit court for
Kenosha county: E. B. BELDEN, Circuit Judge. *Affirmed.*

The plaintiff in error was found guilty of murder in the first degree and sentenced by the circuit court for Kenosha county to confinement at hard labor in the state prison for life. To review this conviction he prosecutes this writ of error.

*Calvin Stewart,* for the plaintiff in error, cited, besides other cases, *Perkins v. State,* 78 Wis. 551, 47 N. W. 827; *Dillon v. State,* 137 Wis. 655, 119 N. W. 352; *Frank v. State,* 94 Wis. 211, 68 N. W. 657.

For the defendant in error there was a brief by *Robert V. Baker,* district attorney, and by the *Attorney General* and *A. C. Titus,* assistant attorney general, and oral argument by *Mr. Baker.* They cited, among other authorities, *Johnson v. State,* 129 Wis. 146, 108 N. W. 55; *Odette v. State,* 90 Wis. 258, 62 N. W. 1054; *Ryan v. State,* 115 Wis. 488, 92 N. W. 271; *Clifford v. State,* 58 Wis. 477, 17 N. W. 304.

TIMLIN, J. The principal error assigned and argued is that the trial court refused to submit to the jury the question of manslaughter in the third degree as defined by sec. 4354, Stats. (1898). That section provides that:

"Any person who shall kill another in the heat of passion without a design to effect death, by a dangerous weapon, in any case except such wherein the killing of another is herein declared to be justifiable or excusable, shall be guilty of manslaughter in the third degree."

No request in writing was presented to the court, but, as shown by the bill of exceptions, the counsel for accused stated orally: "Defendant now moves the court to submit to the jury manslaughter in the third degree under sec. 4354 and appropriate instructions on said section." Under the rule of *Cupps v. State,* 120 Wis. 504, 97 N. W. 210, 98 N. W. 546, the accused cannot, as a matter of strict legal right, predicate error upon the refusal of any instruction so requested. But this court may in its discretion consider the point as raised.

An examination of the evidence satisfies us that the request was properly refused. We will not review in detail the testimony of the witnesses to the homicide on the part of the prosecution, but sum it up by saying that it amply justified the conviction of the accused of the crime of murder in the first degree. To meet this the accused submits only his own testimony showing that the deceased, Smith, the gang foreman, Parker, and a man nicknamed "Baldy" were engaged in construction work on an interurban railway in Kenosha county and boarded at the house of Mr. and Mrs. Linstroth. The accused came to this work about June 13, 1906, a stranger, and the homicide occurred shortly after midnight on June 27th following. The night before the homicide the accused with Parker and Smith and some others were down in Kenosha and indulged in some drinking. They left Kenosha shortly before midnight, taking an interurban car for a point from which they could walk over to the boarding house. On the way over the accused assaulted and struck Parker in consequence of an argument, in which he accused Parker, who was his foreman, of "balling him out" for coming late with the team. Contradicting the other witnesses, he testifies he did not draw a revolver on Parker and made no previous threats, direct or indirect, to shoot or kill Smith. He arrived at the boarding house after midnight, aroused Linstroth, and asked if any of the boarders were in. Informed in the negative he went up to the sleeping room where the accused, the deceased, Parker, and Baldy slept. He remained there a very few minutes and came down and said to Linstroth he was going to send Smith in and let him square up what he was talking about. By this he referred to a question asked him by Smith in the morning; which was whether he was boarding on his looks. Smith had never said anything about this subject before to him, but he had heard other talk on this subject. Smith's words were: "You must be boarding on your good looks. You are paying no money."

Accused answered that it was none of his business how he
was boarding there. He had prior differences with Smith,
but not on this subject. He understood Smith to mean by
this inquiry that he was on familiar terms with the woman
running the boarding house, and this was the reason he after-
ward said to Smith that the latter must come and apologize.
After leaving the boarding house on the night in question he
went down to the stable, stayed a few minutes, and went east-
ward on the crossroad in the direction from which he knew
the deceased, Smith, and the others were approaching. He
met them walking toward him, one Gates leading, and, salut-
ing Gates, asked if Smith was there. Smith said, "Yes, I
am," and asked what was wanted. Accused told Smith he
wanted him to go up to the house and square up that old talk
he had been making. Smith said he would see him in hell
first. Accused retorted with an insulting epithet, and Smith
accused him of having his gun ready and threatened him,
and started across the road toward him, and accused backed
up five or six feet. Smith kept coming until within five or
six feet of accused, and said accused would get what was
coming to him; raised one of his arms, as accused thought,
for a weapon. The accused then shot Smith three times,
killing him instantly. In answer to the question put by his
own counsel, "Why did you shoot there, *Mr. Bradley?*" he
said: "I shot because I thought I had to protect myself."
From sleeping in the same room with Smith he knew that
Smith carried a revolver, and a revolver was found in Smith's
hip pocket after his death.

On cross-examination it was shown that after the alleged
insult in the morning of June 26th he had met Smith at
Linstroth's house at dinner and again at supper, and again
in the evening going down to Kenosha and returning, but
had no conversation with him. He did not ask Smith to
apologize at noontime when Mrs. Linstroth was there because
he did not intend to say anything to him at all, nor at supper

time for the same reason, although he was thinking about it. to a certain extent, but not that he was going to make Smith apologize. He first conceived the idea of forcing Smith to apologize to Mrs. Linstroth about 7 o'clock in the evening preceding the homicide, just before the car upon which they started for Kenosha came up. He did not speak to him about it on the car because that was no place to ask a man such a thing as that—there were too many people around. He wished Smith to apologize to Mrs. Linstroth, but he did not know that Mrs. Linstroth knew anything about the remark made by Smith. He resolved on making Smith apologize because he heard a man named Williams say that Smith had made a remark of a different nature altogether about the accused. He did not wish to wait until morning to have Smith apologize to Mrs. Linstroth because Smith could have gone to Chicago or home and might not come back for a couple of days. Contradicting Linstroth, he said he told the latter he was going to tell Smith to come in and apologize, not that he was going to make him apologize. After leaving the house and going to the barn he went east in the direction from which Smith was approaching because he wanted to see Smith to tell him when he went in there to Linstroth's he could square what he had been talking about. He was not very angry. When he saw Smith move his hand toward his hip pocket he thought Smith was going to shoot him, and he knew what he was doing and thought it was necessary for him to shoot Smith. He thought this right at the time that he would have to shoot him just as he began shooting Smith. He further testified as follows: "Then you didn't shoot Smith because you were angry at him? . A. No; I didn't shoot him because I was angry at him."

On this testimony of the accused there was nothing to warrant submission to the jury of instructions relative to manslaughter in the third degree under sec. 4354, Stats. (1898). This section is not intended to apply to a case where the ac-

·cused justifies the homicide as one committed in self-defense. *Perugi v. State,* 104 Wis. 230, 80 N. W. 593.

The following portion of the charge is excepted to:

"When self-defense is interposed in justification, the first inquiry is as to alleged necessity. No right is to be abused or to be made a cloak for wrongdoing, and therefore the law limits the right of self-defense to necessity as it reasonably appears to the defendant at the time. The taking of human life is of such terrible significance that it cannot be justified by some slight appearance of danger. The person doing the shooting, in acting upon appearances and in taking the life ·of his fellowman, so acts at his peril, and will not be excused unless the circumstances proven were such as would reasonably cause him to believe his act necessary to save his own life ·or to save himself from great personal injury. The reasonableness of the apprehension is to be judged from the stand-point of the defendant at the time, and not from that of the jury now."

The foregoing instruction was appropriate to the instant ·case and not erroneous. The court further instructed the jury as follows:

"If the defendant was in fault in creating the situation of ·danger, his right of self-defense does not arise until he shall have done all that he could reasonably have done to avoid the necessity of killing Smith in order to protect himself."

There is evidence from which the jury would be warranted in finding that the accused was in fault in creating the situation of danger, and the instruction is approved.

At the close of the state's case the defendant moved the court to exclude from the consideration of the jury all the evidence bearing upon the controversy and trouble with Parker as prejudicial, tending to raise collateral issues, in-·competent, and irrelevant in this case. The court denied the motion. This testimony was of the following nature: The accused, on the return from Kenosha and after the party left the interurban car for the boarding house, got into a quarrel with Parker in which the accused was the aggressor.

He accused Parker of having a knife. Parker talked in a conciliatory manner and held up his hands to show that he had no knife, when the accused, presenting or holding a revolver in one hand, knocked Parker down with a blow from the other hand. It does not appear whether Smith saw this affray or not, but he was one of the same group of men returning to the same boarding house, and it might be inferred that he knew of it. The testimony was competent to show the quarrelsome and homicidal disposition of the accused nearly up to the time of the homicide toward his workmates, members of this same group on this return trip. *Kernan v. State,* 65 Md. 253, 4 Atl. 124.

Other errors are assigned in the admission and exclusion of evidence. We have carefully considered them, but they are not, in our opinion, of sufficient importance to justify separate discussion. We find no error in the proceedings prejudicial to the accused, and the judgment of conviction must be affirmed.

*By the Court.*—Judgment affirmed.