ECKMAN, Plaintiff in error, vs. THE STATE, Defendant in error.

*April 10—October 12, 1926.*

*Homicide: Instructions: On self-defense: Excusable homicide: Premeditated design: Good character: Verdict of jury: Weight on appeal.*

1. On appeal from a conviction on materially conflicting evidence, it must be assumed that the jury believed the testimony on behalf of the state and disbelieved that which contradicted it.   p. 69.
2. The evidence in a conviction of first-degree murder is reviewed, and it is *held* that upon the whole evidence the jury might properly find the defendant guilty although there was evidence which, if believed by the jury, would have warranted a finding of heat of passion on the part of the defendant, or an accidental killing.   p. 75.
3. An instruction in a prosecution for murder that an intent to kill will be presumed "when" a gun is pointed at another and voluntarily discharged is not erroneous as assuming the existence of facts on which the presumption was based.   pp. 76, 77.
4. An instruction on the presumption of intent when a gun is discharged with the intention of disabling a person, although inapplicable in the absence of a showing of intention to disable, is not prejudicial in view of other instructions on intent.   p. 78.
5. An instruction which required the jury to find such circumstances "proven" as would justify self-defense is not erroneous as requiring self-defense to be established by a preponderance of the evidence, since the word "proven" was used in the sense of "testified to."   pp. 78, 79.

6. Palpable and prejudicial error in an instruction, especially in a capital case, is not excused because the instruction was requested by the defendant.    p. 79.

7. Instructions which made the defense of excusable homicide applicable to every phase of the evidence and quite distinctly set out each set of facts to which the defense was applicable, are *held* favorable rather than prejudicial to the defendant. p. 80.

8. An instruction that the intent to kill at any moment before or at the time of the commission of the act resulting in death was sufficient, is not erroneous, as the instructions as a whole were addressed to the time of the affray and did not permit the jury to convict if the intent had existed some time before but not at the time of the killing.    p. 80.

9. An instruction on the weight to be given character evidence is *held* not erroneous as authorizing its consideration only as negativing intent.    p. 81.

10. Where the homicide was admitted, evidence of good character may be considered only to determine whether the shot was fired accidentally, as alleged by defendant, or with premeditated design.    p. 82.

11. Instructions on intent and defining first-degree murder, considered with other instructions, are *held* not erroneous as failing to take into account circumstances sufficient to reduce the offense to voluntary manslaughter, where the court fully and carefully charged the jury with reference to each of the degrees of homicide submitted.    pp. 82–84.

CROWNHART and ESCHWEILER, JJ., dissent.

ERROR to review a judgment of the circuit court for Walworth county: E. B. BELDEN, Circuit Judge. *Affirmed.*

Homicide. The plaintiff in error, hereinafter called the defendant, was charged with the murder of Carl Fritz at the town of Sharon, Walworth county, on the 15th day of July, 1923. The trial began October 15, 1923, and the case was submitted to the jury on October 21st. The jury returned a verdict finding the defendant guilty of murder in the first degree. Judgment of conviction was entered thereon. Bill of exceptions was settled on the 14th day of October, 1925. The defendant sued out writ of error in this case to review the record.

*Clarence S. Darrow* and *Harold O. Mulks,* both of Chicago, for the plaintiff in error.

For the defendant in error there was a brief by *Alfred L. Godfrey,* district attorney of Walworth county, the *Attorney General,* and *J. E. Messerschmidt,* assistant attorney general, and oral argument by *Mr. Godfrey* and *Mr. Messerschmidt.*

The following opinion was filed June 21, 1926:

ROSENBERRY, J. The defendant alleges that the judgment should be reversed, and nine errors are relied upon for reversal.

"1. That the court erred in entering judgment upon the verdict and denying defendant's motion for a new trial, upon the ground that the evidence was insufficient to establish defendant's guilt of murder in the first degree beyond a reasonable doubt.

"2. That the court erred in giving to the jury the following instruction:

" 'In the absence of evidence to the contrary, one who takes the life of another by the infliction of a wound by some act naturally and probably calculated to produce death is presumed to have intended that result; and when one points a loaded gun, which the law says is a dangerous weapon—even if broken, as has been testified the gun in question was broken—at a vital part of the body of another, and voluntarily discharges it with the intention, at least, of disabling the latter, and the life of the person thus fired upon is taken in consequence of such act, the law presumes that the natural, usual, and ordinary consequences of the act were intended, and hence that death was intended.'

"3. That the court erred in giving the following instruction to the jury:

" 'This is what is known in the law as the law of self-defense. When self-defense is introduced in justification of a homicide, the first inquiry is as to the alleged necessity. No right is to be abused or to be made a cloak for wrongdoing, and therefore the law limits the right of self-defense to necessity as it reasonably appears to defendant

at the time. The taking of human life is of such terrible consequence that it cannot be justified by some slight appearance of danger. The person doing the shooting, in acting upon appearances and taking the life of his fellow man, so acts at his peril and will not be excused unless the circumstances proven are such as would reasonably cause him to believe his act necessary to save his own life, or the life of his wife or servant, or to save himself or his wife or servant from great personal injury. The reasonableness of the apprehension is to be judged from the standpoint of the defendant at the time he fired the fatal shot.'

"4. That the court erred in giving to the jury the following instruction:

" 'The defendant had a right to defend himself, or any member of his family, against an assault by Fritz, if such assault was committed, by lawful means, with usual and ordinary caution, and without unlawful intent; and if, while so defending, he, through accident and misfortune, shot and killed the deceased, the killing was excusable; and if you so find, then you should find the defendant not guilty.'

" 'The defendant had a right to have in his hands and aim his shotgun at or towards the deceased for the purpose of deterring or preventing the deceased from continuing or renewing his assault upon the defendant and the members of his family, if such assault was made. This was a lawful means of defense, and if done with usual and ordinary caution and without unlawful intent, and the shotgun was discharged, and the deceased killed by accident and misfortune, then the killing was excusable, and if you should so find, then you should find the defendant not guilty.'

" 'The defendant had a right to have in his hand and aim a shotgun at or towards the deceased for the purpose of deterring and preventing the deceased from continuing or renewing his assault upon the defendant himself, or any member of his family, if such assault was committed. This was a lawful means of defense, and if, while so doing, the shotgun was discharged and the deceased killed by accident and misfortune while the defendant was in the heat of passion upon any sudden and sufficient provocation, then the killing was excusable, and if you so find, you should find the defendant not guilty.'

"5. The court erred in giving to the jury the following instruction:

" 'While the law requires, in order to constitute murder in the first degree, that the killing shall be from premeditated design, still, as I have suggested, it does not require that such premeditation shall exist for any particular length of time before the homicide is committed. It is not necessary that the killing should have been brooded over or reflected upon for a week, a day, or even an hour. The human mind acts with a celerity which it is impossible to measure, and whether the premeditated design to kill was formed must be determined by the jury from all the credible evidence in the case. It is sufficient if there was such a design or intent in the slayer's mind at any moment before or at the time of the commission of the act resulting in death. There may be no perceptible space of time between the forming of the design and the act resulting in death. If there was a sufficient deliberation or premeditation had to form a purpose or design to take life, then there was, in the law, sufficient premeditation to constitute murder in the first degree, regardless of whether the design to take life had been for a long time contemplated by the slayer, or whether the design to kill was formed by him at the instant of the act. It is enough that the intent to kill preceded the fatal act, although the act followed instantly.'

"6. The court erred in giving the following instruction to the jury:

" 'You are instructed that, in case of homicide, the nature and qualities of the act producing death and the responsibility of the accused therefor are to be found in the act and the circumstances surrounding its commission. Where a homicide is admitted, evidence of good character goes only to the intent of the accused. It is your duty to consider such evidence, together with all the credible evidence in the case. Such evidence is entitled to all the consideration you think proper to give it under all the circumstances shown in the case.'

"7. The court erred in giving to the jury the following instruction:

" 'A killing is not justifiable if it takes place after the peril has passed or is by way of revenge for injury al-

ready inflicted.   The defendant had the right to lawfully defend his person and that of his wife and servant when there was reasonable ground to apprehend a design to commit a felony or some great personal injury, and there was reasonable cause for believing that there was imminent danger of such design being accomplished; and if the defendant shot the deceased in the exercise of that right, killing him, then the killing was justifiable, and if you so find, you should find the defendant not guilty.'

"8.  The court erred in giving to the jury the following instruction:

" 'You will observe that, to constitute murder in the first degree, the act causing death must have been perpetrated from premeditated design.   Premeditated design to kill means intent to kill.  "Design" means intent, and both words essentially imply premeditation or design formed before the act.   The premeditation of the statute does not exclude sudden intent, and need not be slow or last long.   Premeditated design need be only such deliberation or consideration or thought as enables a person to appreciate, at the time the act is committed, the nature of his act and the probable consequences.   It is sufficient to satisfy this statute if the person committing the homicide has, at the time of committing the act charged to have caused the death, a design to take human life, and commits the act with the purpose of accomplishing such design, and that death ensues, there being no circumstances to render the homicide justifiable or excusable.'

"9.  That the court erred in giving to the jury the following instruction:

" 'If you find from the evidence beyond reasonable doubt that the defendant, before committing the act resulting in death, had formed in his mind the definite intent or design to take the life of Fritz and that the shot which killed Fritz was fired by the defendant in furtherance of such design, without justifiable cause or excuse therefor as hereinafter explained, then you should find the defendant guilty of murder in the first degree.' "

It is very earnestly argued here that the evidence offered upon the trial was of such a character that the jury could

not thereon find the defendant guilty of murder in the first degree beyond a reasonable doubt. A determination of the question thus raised has required us to examine in detail the entire record. · It would extend this opinion to an unwarrantable length and serve no useful purpose to set out a complete synopsis of the testimony in the case. The jury found upon the facts in favor of the State. It must be assumed, therefore, that where there is a material conflict in · the evidence the jury believed the testimony offered by the State and disbelieved that which contradicted it.

The defendant at the time of the shooting was a man fifty-four years of age, having been born in Sweden in 1869, coming to America in 1888. He had worked at various employments and some years ago came to Walworth county and settled upon a farm. He was five feet seven inches tall and weighed about 130 pounds. He had been throughout his life a peaceable, law-abiding citizen. Carl Fritz, the deceased, was also a native of Sweden, thirty-nine years of age, about six feet in height, and weighed 180 pounds, was physically strong and in vigorous health.

Fritz and *Eckman* were acquainted for some eighteen years prior to the shooting. Up until within nine months of the shooting they had been fast friends. Fritz had been married three times. His first wife died; he was divorced from his second wife, and was living with his third wife for some few months before the shooting. Fritz and his first wife had visited with the Eckmans on their farm (not the farm in question) for two or three weeks at a time, and the Eckmans had entertained Fritz's wife when she was sick and cared for her. A year or so before the shooting Fritz had stayed with *Eckman* on his present farm for two or three weeks. When he went away he left a shotgun and a-pair of rubber boots, as he claimed. In September he came to *Eckman* for his shotgun, and with *Eckman* searched the house thoroughly to find it, but it was miss-

ing. He then in effect charged *Eckman* with stealing it, and *Eckman* resented this and told him to stay away from his house and not come back. Fritz came back in October and had words with *Eckman* near the barn; and, according to *Eckman,* assaulted him, but *Eckman* escaped into the barn. On Sunday, July 15, 1926, Fritz and his wife went by automobile to the farm of the defendant. Fritz and his wife left home about 1 o'clock in the afternoon dressed in their ordinary Sunday apparel, and after calling at a number of other places arrived at the Eckman farm about 2 o'clock in the afternoon. They approached from the south on the highway leading north and south by the Eckman premises. When they reached the Eckman residence they turned in on a driveway to the south of the Eckman residence, leading in an easterly direction, passing to the rear of the Eckman house and woodshed. They stopped at a point seventy-five feet distant and northeasterly from the Eckman house. It appears without dispute that at that moment *Mr.* and Mrs. *Eckman* and Einar Carlson were in the Eckman house,—*Eckman* was lying partially asleep on a bed in a room off the kitchen, Carlson was lying on a couch in the dining-room near the door between the dining-room and kitchen. Oscar Johnson, a friend and partner of the defendant, was lying under a tree in the yard at a point northwesterly from the place where Fritz stopped his car. Mrs. Fritz remained in the car, Fritz got out and walked to the place where Oscar Johnson was lying, greeted him,—whether in English or Swedish it is not clear. After some casual conversation they walked to the Eckman house together, ascended the steps leading to the porch on the easterly side of the kitchen. Fritz told Johnson that he wanted to get some boots which belonged to him that were in the Eckman house. Mrs. Eckman testified that she saw the Fritz car as it drove in the yard and closed and bolted the kitchen door. In any event, when the kitchen

door was reached by Fritz and Johnson it was opened. Johnson passed into and through the kitchen to the stairway leading from the front hall to the second floor, leaving Mrs. Eckman and Fritz alone in the kitchen. Mrs. Eckman's version is that Fritz pushed the door open when she tried to close it and came in. She then said to Fritz: "We don't want you to come into this place. I told you so many times not to come into our place any more." Fritz replied: "I got a right to come into this place. I want my gun." She said: "Carl, I have not got your gun." Then she says Fritz took hold of her, one hand on her throat and one hand on her hair and pulled it so hard and said: "If I don't get my gun today I kill you all." She then screamed and called to *Eckman* for help. It is very difficult to state accurately what then happened in the kitchen. It appears, however, that Johnson and Carlson and *Eckman* appeared immediately upon the scene. Whether *Eckman* brought the gun with him or went back after it is not clear. There was a struggle in the kitchen, as a result of which it is claimed that the gun stock, which had been previously broken and repaired, was separated into two pieces. The four finally succeeded in pushing Fritz out of the kitchen door onto the kitchen porch. There he and Johnson struggled over a churn dasher. Fritz had hold of the dasher end and Johnson had hold of the handle. In the struggle Fritz pulled, the dasher end came off, and he fell or stumbled backward down the steps onto the ground. In the meantime *Eckman* had recovered possession of the gun and was on the back porch with it in his hands. Mrs. Fritz saw it there, she having in the meantime left the automobile and come to the aid of her husband. She says at the time she saw it in *Eckman's* hands the stock was not broken. It seemed to be established by the physical facts beyond reasonable controversy that when *Eckman* was standing on the back porch with the gun, or at least with the gun barrel with part of

the stock in his hands, while Fritz was on the ground some three or four feet away from the lowest step of the steps leading to the kitchen porch, the gun was discharged by *Eckman,* the charge striking Fritz on the inner part of the left thigh just below the groin, severing the large arteries in the leg. After he was shot, Fritz with the assistance of his wife crawled from the point where he fell about eight feet to a point northeasterly of the kitchen steps. During the time that Fritz crawled this distance *Eckman* stood upon the porch cursing. After Mrs. Fritz had assisted her husband across the planks she ran into the Eckman house and asked permission to use the telephone. *Eckman* refused permission to use the telephone and ordered her to leave. Mrs. Fritz then ran to the neighbor's, some rods away, for help. While she was gone *Eckman* gave Fritz no assistance. When Mrs. Fritz returned accompanied by Mrs. Wiedemer, the neighbor's wife, she found her husband dying. She knelt down beside him, offered a prayer, and while so doing *Eckman* stood upon the porch still continuing to curse and swear. After she had offered her prayer Mrs. Fritz stooped over and kissed her husband on the cheek. As she did so *Eckman* said: "Jesus Christ, did you ever see anything so God damned foolish?" Mr. Wiedemer, the neighbor who had come to the assistance of Mrs. Fritz, went to the well and brought a pail of water with which to bathe Fritz's face. As he returned with the water *Eckman* said: "I wouldn't carry him any water. Let the damned pup die." Fritz lived for about ten minutes after the shot was fired. The testimony given by *Eckman,* Mrs. Eckman, Einar Carlson, and Oscar Johnson is in direct conflict at so many points with well established incontrovertible physical facts that the jury no doubt declined to accept their version of the affray for that reason. On the other hand, it is proven beyond serious question that Fritz had made repeated demands upon *Eckman* for the production of the

gun; that he told him he would either have to produce the gun or pay for it, and that he had made repeated threats against *Eckman,* saying that he would get him, or language to that effect.   It also appears without dispute that he had been forbidden to come into the Eckman home, had been warned to stay away, and that the circumstances were such that his demand for the production of his rubber boots, if the demand was to go no farther than that on July 15th, was almost certain to produce at least a wordy altercation. *Eckman* was in his home where he had a right to be and which he had a right to defend.   It also appears, although it is denied by *Eckman,* that *Eckman* had made threats against Fritz, and there was an abundance of evidence to show that *Eckman* had a very bitter and vindictive feeling against Fritz, principally because of Fritz's accusation that *Eckman* had been guilty of stealing his property.   Nor can it be overlooked that Fritz was a strong, powerful man of an aggressive, dominant disposition and very much inclined to assert his rights.   It also appears, however, that at the moment the fatal shot was fired Fritz had been put outside of the house by the combined force of its occupants; that he was not on the step, he was on the ground some distance away; and while the defendant testified that he appeared to be about to re-enter the house, the defendant being supported in that testimony by those present excepting Mrs. Fritz, the place where Fritz fell seems to make it conclusive that if he had any intention of re-entering the house, as one of his disposition and character might well have had, he had taken no step to put it into execution.   Fritz knew that the defendant and his friends were in possession of the gun.   There had been a struggle for its possession in the kitchen, during which it had fallen upon the floor. That he would return up a flight of steps in the face of a gun to attack the group which had ejected him from the house may have seemed to the jury highly improbable.   The

tread of the steps was one foot wide, one riser was eight inches, and there were four risers of seven inches each, making the total elevation of the porch floor above the level of the approach to the steps thirty-six inches. The steps were six feet four inches long. The porch was of equal length and four feet wide.

Einar Carlson was a young man twenty-three years of age; Oscar Johnson was a man about sixty years of age. They were both friends of *Eckman*. Fritz did not go upon the Eckman premises dressed for an affray. He carried no weapon of any kind. He drove to a point on the Eckman premises from which flight would have been difficult. He apparently made no preparation for a struggle of any kind. Upon getting out of his car he went to the place where Johnson lay, wakened him, and asked him to accompany him to the house, which he probably would not have done, knowing Johnson's friendship for the Eckmans, had he had any intention of doing violence to *Eckman*. If the statements made by the defendant's witnesses as to Fritz's physical prowess are true, his ejectment from the kitchen and the porch floor and porch steps must have been to some extent a retreat on the part of Fritz. It should be said that the testimony of Mrs. Fritz contradicts that of the defendant and his wife at many points and seems to be much more in accord with the established physical facts than that of the defendant and his associates.

It is quite probable, as was said by the defendant's counsel upon the oral argument, that the controlling fact in the determination of the issues by the jury was the conduct of *Eckman* immediately after the shooting. With his enemy down and rapidly bleeding to death, unless his heart was filled with violent passion and hatred he could scarcely have conducted himself as he did. It may well be that in the gang world of the large cities a different interpretation would be placed upon the facts of this case, but the actors

in this tragedy were peaceable, law-abiding farmers, neither of whom, so far as the evidence shows, had any other trouble than that which has before been briefly referred to; that they had both become very much exercised and worked up over the disappearance of the gun, which was an undisputed fact in the case, there can be no doubt. The evidence was heard by a jury composed of men who thoroughly understood the situation of the parties and appreciated all of the circumstances. In addition to what has been said, *Eckman* was taken by the sheriff to the county jail. He ate heartily, played cards during the evening of that day, and slept soundly, although he claims that he was so excited that he could remember very indistinctly what took place after the struggle in the kitchen began. One of his neighbors testified that he appeared to be calm and collected. There is no doubt that there was considerable excitement all around, not only among the participants but among the witnesses. An occasion of this character, happening in a quiet farming community on a Sunday afternoon, must have been the cause of much excitement.

We have carefully reviewed the testimony, and it is the deliberate judgment of the court that upon the whole evidence the jury might properly say that the defendant was guilty of murder in the first degree beyond a reasonable doubt. There was evidence which would have warranted a finding of heat of passion on the part of the defendant which would have reduced the grade of his offense. The jury evidently disbelieved that testimony, nor did they accept defendant's claim that the shooting was accidental or without his knowledge or express intent. The gun was brought from the kitchen onto the porch and there discharged, although the defendant testified that it was discharged from the dining-room. The physical facts show quite conclusively that had it been discharged from the dining-room while the defendant was picking it up, that

Fritz could not have met his death in the manner which he did.  Mrs. Fritz testified that the defendant had the gun in his hands, his left hand on the barrel of the gun, the muzzle pointing up, his right hand on the stock, and then he pointed it at her husband and discharged it.

The learned trial judge, who heard all of the evidence, saw all of the witnesses, who has had a large experience in the trial of cases, approved the finding of the jury, and in that approval this court concurs.

We turn now to a consideration of procedural error.  It is contended on behalf of the defendant that the instruction set out in the second assignment of error is fatally defective for the reason that it assumes the existence of vital and material facts that were subjects of controversy in the evidence:

"1st.  That defendant pointed the gun at a vital part of the body of the deceased.

"2d.  That he voluntarily discharged it.

"3d.  That he did so with the intention, at least, of disabling the deceased."

Probably no instruction could be drawn which could successfully meet the criticism leveled at this instruction.  It is taken out of its context,—it is considered apart from the remainder of the instruction given by the court and made to mean something which the court did not intend it to mean. The criticism of the instruction entirely overlooks the effect of the word "when."  It simply says that when one does certain things, then certain legal consequences follow. When one points a loaded gun, if he does so point it and discharge it while it is pointed at a vital part of the body of another, if he does so discharge it and the life of the person thus fired upon is taken, the law presumes that when he has so pointed it and so discharged it that he intended by so doing the natural, usual, and ordinary consequences of his act and hence death was intended.  The court was

instructing the jury on what constituted sufficient proof of intention to kill. When one intentionally points a loaded gun at the vital part of the body of another and discharges it, it cannot be said that he did not intend the natural, usual, and ordinary consequences. The court did not say that the defendant had so pointed the gun or so discharged it, and in his charge gave full and complete instructions upon death by accident or misfortune. This instruction is expressly approved in *Beauregard v. State,* 146 Wis. 280, 131 N. W. 347; *Cupps v. State,* 120 Wis. 504, 97 N. W. 210, 98 N. W. 546.

It is further argued that the language:

"When one points a loaded gun . . . at a vital part of the body of another, and voluntarily discharges it, with the intention, at least, of disabling the latter, and the life of the person thus fired upon is taken in consequence of such act, the law presumes that the natural, usual, and ordinary consequences of the act were intended,"—

was prejudicial. This part of the instruction was not applicable to the facts in the case. *Eckman* testified that he did nothing to fire the gun; that he did not aim the gun at Fritz; that he had no intention of killing Fritz; that he did not know there was a shell in the gun, and that he simply showed the gun to Fritz to scare him away. There was no claim on the part of *Eckman* that he fired the gun with intent to disable rather than an intent to kill, so that if the instruction in that respect be technically erroneous it could not have been prejudicial to the defendant. The jury were thoroughly, carefully, and exhaustively instructed in regard to the intent which must be proven and established beyond a reasonable doubt in order to warrant them in finding the defendant guilty of murder in the first degree. The court said:

"You will observe that to constitute murder in the first degree the act causing death must have been perpetrated

from premeditated design. ˙ Premeditated design to kill means intent to kill. 'Design' means intent, and both words essentially imply premeditation˙or design formed before the act. The premeditation of the statute does not exclude sudden intent and need not be slow or last long. Premeditated design need be only such deliberation or consideration or thought as enables a person to appreciate at the time the act is committed the nature of his act and the probable consequences. It is sufficient to satisfy this statute if the person committing the homicide has, at the time of committing the act charged to have caused the death, a design to take human life, and commits the act with the purpose of accomplishing such design, and that death ensues, there being no circumstances to render the homicide justifiable or excusable."

By consent of counsel the jury was permitted to take the written instructions to the jury room with them. The instruction complained of in the second assignment of error immediately followed the foregoing and was followed by another paragraph further elaborating what was meant by "premeditated design," and it must be read in connection with the whole instruction. When so read, no error appears.˙

In support of the third assignment of error it is urged that the use of the words "unless the circumstances proven are such" required the jury to find, before they could acquit the defendant on the ground of self-defense, that a justifiable homicide must be established by at least a preponderance of the evidence, and that a mere reasonable doubt as to whether the killing was in justifiable self-defense was insufficient to justify an acquittal.

This instruction was approved in *Bradley v. State,* 142 Wis. 137, 124 N. W. 1024. The use of the word "proven" may be subject to some criticism. What the court intended to say, and no doubt what the jury understood the court to say, was that the person doing the shooting had a right to act upon appearances, but acts at his peril unless the facts and circumstances disclosed by the evidence are such

as would reasonably cause him to believe his act necessary to save his own life. The word "proven" is often used in the sense of "testified to" and was so used in the instruction. The jury were over and over again informed that they were the sole judges of the facts, and under all the instructions it could have had no other understanding of the language complained of than that the circumstances as they actually existed must have been such as warranted the defendant from his viewpoint in proceeding to extremities. There was no intimation that any particular quantum of proof was required. The term "reasonable doubt" was defined, and its application to all the various degrees of homicide submitted to the jury was fully explained. There was no error.

In support of the fourth assignment of error it is urged:

"(1st) That the court erroneously coupled, in each of the three instructions, the elements of justifiable homicide and the elements of an excusable homicide, and led the jury to believe thereby that the existence of both was essential to an acquittal.

"(2d) That the jury were, in effect, instructed that, in order to acquit, the facts stated in the instruction must be established by a preponderance of the evidence."

The instruction complained of was one requested on behalf of the defendant and was given to the jury in the language used in the request. While this would not, especially in a capital case, excuse palpable and prejudicial error, it should be said that the defendant was represented by able counsel who undoubtedly intended to state a correct rule of law. The language is not susceptible to the construction now attempted to be placed upon it.

The instruction complained of contains no element of justifiable homicide as defined by sec. 340.29, Stats. Each of the instructions refers to the circumstances under which the killing might have been found by the jury to be excusable. The instructions must be read and understood with reference to their application to the facts in this case. The

evidence was such that if the jury believed the defendant's version of the occurrence it could find that the killing was done by accident or misfortune while defendant was performing a lawful act by lawful means with usual and ordinary caution without unlawful intent.   If the killing was done under these circumstances it constituted excusable homicide as defined by sec. 340.30.   The instructions made the defense of excusable homicide applicable to every phase of the evidence, and, instead of combining the instructions in a way which required all of the enumerated facts to exist, it quite distinctly set out each set of facts to which the defense of excusable homicide was applicable.   The instruction as given is favorable rather than prejudicial to the defendant.

The fifth assignment of error relates to paragraph 29 of the instructions, which appears between paragraph 28, already set out at length in the discussion of the second assignment of error, and paragraph 30, which forms the basis of the third assignment of error.   The use of the following words is said to constitute error:

"It is sufficient if there was such a design or intent in the slayer's mind at any moment before or at the time of the commission of the act resulting in death."

It is urged that by the use of these words the jury were erroneously instructed that the defendant could be guilty of murder in the first degree even though he did not have the intent to take the life of the deceased at the time the shot was fired, if he had such an intent at some moment before—a day, month, or year before.

It hardly seems necessary to say that this is a strained and irrational construction of the language used.   When the instruction is taken as a whole it is perfectly plain that the court was addressing itself to the time covered by the affray, and the idea that under the instructions the jury were per-

mitted to find murder in the first degree if they found the defendant had such an intent a month or a year before, although he did not have it at the time of the occurrence, is hypercritical and manifestly not a fair criticism.

In support of the sixth and seventh assignments of error it is said that the only construction to be placed upon the language set out in this assignment as applied to the case at bar was:

"Where, as in this case, the killing is admitted, evidence of the good character of the accused, if you find he had a good character, is to be considered by you only as negativing an intent on his part to kill the deceased. Its weight, if any, for that purpose is for you to determine. If you, after a consideration of all the evidence in the case, including character evidence, believe beyond a reasonable doubt that the defendant did intend to kill the deceased, then such evidence is not to be considered by you for any purpose."

It is difficult to answer such an argument, for a mere statement of it seems to carry refutation with it. The language of the instruction is supported by *Hogan v. State,* 36 Wis. 226.

Mr. Chief Justice RYAN said:

"The homicide being admitted, in such a case, evidence of good character could go only to the intent of the plaintiff in error. . . . The danger of the act, the depravity of mind, the regardlessness of human life, belong essentially to the act itself, and are made by the statute dependent on it. The nature and qualities of the act producing death are to be found in the act and the circumstances of its commission; and the good or bad character of the accused can have no possible bearing upon them."

As has been already indicated, the defendant appears to have been a peaceable, law-abiding citizen. There was a claim on his part that the shooting was accidental and that he did not do it with an intent to kill and murder the deceased. The jury were instructed that in their consideration

of that aspect of the case they might take into account the evidence of good character which had been admitted along with all the other credible evidence in the case in determining whether or not the defendant fired the shot accidentally or with premeditated design, and it seems clear in this case that evidence of good character could perform no other office. It was conceded that the defendant fired the fatal shot. The only issuable fact remaining was as to the intent of the defendant at the time he performed the act.

In the eighth and ninth assignments of error, counsel for the defendant bring together two widely separated paragraphs of the charge, removed from their proper context, and it is then argued that both of the instructions positively direct a verdict of murder in the first degree, absolutely and at all events, if the jury found that the defendant intentionally killed the deceased and that the killing did not take place under such circumstances as to constitute justifiable homicide; (2d) that in a homicide case where the evidence shows that the deceased attacked the accused, even if the facts are not sufficient to show a reasonable apprehension on the part of the accused that the deceased was either about to slay him or inflict upon him grievous bodily harm, nevertheless it may be sufficient to reduce the offense to voluntary manslaughter; and that the instruction does not sufficiently take into account that rule of law.

Both of the instructions indicate in plain and unmistakable language that the accused, to be guilty of murder in the first degree, must have formed in his mind a design to take human life and then must have committed the act in furtherance of that design or with the purpose of accomplishing such design.

In *Perugi v. State,* 104 Wis. 230, 80 N. W. 593, the court said:

"We cannot resist the conclusion that every killing, not justifiable, done with that degree of deliberation and with

an intent or design sufficiently fixed and settled in the mind as to come within the rule of 'premeditated design' laid down in the statute and interpreted by the decisions of this court, is murder in the first degree. . . . The intentional killing that may exist consistent with manslaughter in the second degree is the intent which 'springs from momentary impulse, when the mind is unbalanced, and there is no opportunity for consideration or deliberation."

In *Anderson v. State,* 133 Wis. 601, 114 N. W. 112, the following instruction was held to be strictly correct:

"If there was a design to effect death on the part of the defendant, the case does not fall within this or any degree of manslaughter."

Counsel for the defendant put forth the following proposition:

"Suppose a case where a party without fault is wantonly attacked and slays his assailant. Let us suppose the evidence falls just short of justifiable homicide. The jury believe that the accused did not apprehend that the deceased was about to take his life or inflict great bodily harm; that all he apprehended was a battery that would not cause a serious injury, or that the accused did so apprehend, but that his apprehension was unreasonable.

"In either case he could not be acquitted on the ground of justifiable homicide in self-defense. Does it follow that because the circumstances shown are insufficient to completely establish a justifiable homicide and render the accused absolutely guiltless that he necessarily and at all events is a deliberate murderer? Does it follow that because, perhaps, of fear, terror, and excitement the defendant's conception and judgment of the situation falls below the standard of the average man of ordinary courage, prudence, and calmness that he should be branded as and suffer the same punishment as the highwayman who slays his unsuspecting victim?"

It is further said that "the enlightened conscience of the civilized world rejects such a doctrine," and well it may.

The instructions complained of were given by the court as a part of the definition of murder in the first degree. In the plainest and most unmistakable language the court charged the jury that if upon the whole evidence the defendant did not perform the act which resulted in the death of Fritz with a premeditated design to effect his death, that he was guilty of some other degree of homicide than that of murder in the first degree unless it was justifiable or excusable; that where actual intent to kill with express malice afterthought was wanting, the offense could not be murder in the first degree. In giving the instructions to the jury in reference to manslaughter in the second degree the court advised the jury that if the killing was intentional, unnecessary, and occurred while the defendant was resisting an assault or attempt on the part of Fritz to assault the accused or his wife or after such assault was attempted and had failed, the defendant was guilty of manslaughter in the second degree. The court carefully and thoroughly charged the jury with reference to each of the degrees of homicide submitted. Had the jury believed that the defendant, because of fear, terror, or excitement, fired the shot, it could not under the instructions have convicted the defendant of murder in the first degree. The jury was given wide latitude under the instructions to place such interpretation upon the evidence as in their view was warranted. The rights of the defendant were fully protected.

The instructions were prepared with great care and are supported at every point by authority. It may be said that few records have appeared in this court where the defendant was accorded a fuller, more complete opportunity to acquit himself than was given the defendant in this case. He was given every possible consideration at every step in the trial. The record discloses an entire absence of the atmosphere

Eckman v. State, 191 Wis. 63.

that is sometimes, without design on the part of any one, present in a murder trial.   There was apparently no appeal to prejudice, and the trial throughout was conducted on both sides in a lawyerlike way with due regard for the legal rights of the defendant and the seriousness of the offense charged both to the State and the defendant.   The criticisms made upon the charge are in the main an attack upon the law of homicide as it exists in this state.   Decisions are brought to us from other states and urged upon our consideration without regard to the body of law of which they form a part.   A criticism of the instructions in regard to intent in first-degree murder is in point.   It may be that an attempt to codify the criminal law and reduce the definition of homicide to a few clearly distinguishable classes brings some confusion as well as a great deal of clarity.   Our statute does not use the words "with malice aforethought," but uses instead the words "premeditated design."   Design has been defined as intent, and intent has been defined as it was defined by the court in this case, as including the element of malice aforethought at common law.   The court in this case used those words in its instructions.   The jury could not possibly have misunderstood what was meant by murder in the first degree as defined by our statutes.   Under the instructions, had the jury believed the evidence offered on behalf of the defendant they might have found him guilty of some lesser degree of homicide.   That they did not, makes it quite apparent that they rejected the defendant's version of the affair as well as that of the remaining eye-witnesses other than Mrs. Fritz.   That there was ample evidence to warrant the finding made by the jury there can be no doubt.   While the consequences to a man of previously good reputation are most momentous, they follow upon acts done by him, as found by the jury, with the premeditated design to take the

life of a fellow man without excuse or justification. The determination of the jury, affirmed by the court and upon which judgment was pronounced, cannot be disturbed.

*By the Court.*—Judgment is affirmed.

The following opinion was filed July 7, 1926:

CROWNHART, J. (*dissenting*). This court heretofore has held, in a long line of decisions, that the defendant in a criminal case, especially one involving capital punishment, is entitled to the solemn judgment of each member of this court as to whether the evidence establishes the guilt of the defendant beyond reasonable doubt.

In *Lonergan v. State,* 111 Wis. 453, 456, 87 N. W. 455, Mr. Justice WINSLOW, writing for the full court, said:

"In criminal cases, and especially in a prosecution for a capital offense, the defendant has a clear right to have his guilt determined by the court as well as by the jury. 'If the verdict does not satisfy the conscience of the judge, the prisoner is entitled to a new trial.' The accused has the right to have 'the solemn opinion of the judge who tried the cause, after a careful hearing of all that may be alleged against its justice, that it ought to stand.' . . . Not only has he this right to the solemn judgment of the trial judge, but he has also the right upon writ of error, if the question is properly presented by the record, to demand the deliberate opinion and judgment of this court upon the question whether his guilt was sufficiently proven."

The above principle has been affirmed in *Prinslow v. State,* 140 Wis. 131, 136, 121 N. W. 637; *Gerke v. State,* 151 Wis. 495, 496, 139 N. W. 404; *Koscak v. State,* 160 Wis. 255, 269, 152 N. W. 181; *Hamilton v. State,* 171 Wis. 203, 209, 176 N. W. 773; *Manna v. State,* 179 Wis. 384, 392, 192 N. W. 160.

I have given the evidence in this case very careful consideration, and I am constrained to dissent from the ma-

jority opinion for the reason that I am convinced that the defendant was not guilty of murder in the first degree.

*Eckman* was a farmer, coming to this country from Sweden in early life.  He was married and had lived on a farm for several years.  He was a man of peaceful habits and of good character.  Ten of his neighbors testified to his peaceful disposition and to his excellent reputation and character.  *Eckman* and Fritz had been acquainted for some seventeen years, and on many occasions *Eckman* had befriended Fritz.  He had taken Fritz and his wife into his home and had entertained them for some length of time, without charge, on different occasions.  On the last occasion Fritz had visited with *Eckman* for a couple of weeks early in 1922, and then Fritz went south, where he stayed for some time.  When he went away, Fritz left at *Eckman's* a shotgun and a pair of rubber boots.  Upon his return he asked for the shotgun, and *Eckman* with Fritz searched the house thoroughly to find the gun, but it was missing.  Fritz then, in effect, charged *Eckman* with stealing the gun, whereupon *Eckman* ordered Fritz from his house and told him never to return.  This was in September, 1922.  In October, Fritz went to *Eckman's* farm.  *Eckman* was working near his barn.  Fritz repeated the demand for his gun, and after some discussion he assaulted *Eckman,* who escaped and ran into the barn.  Thereafter Fritz told four different unimpeached witnesses of the trouble he had with *Eckman* about the gun, and threatened to do *Eckman* great bodily harm.

Such was the situation on Sunday, July 15, 1923.  On that day, about 2:30 p. m., Fritz with his wife drove into *Eckman's* yard with an automobile.  Leaving the automobile with his wife therein about seventy-five feet from the west entrance to *Eckman's* kitchen, he went over to a tree, where a partner of *Eckman,* by the name of Johnson, was lying on

the ground asleep.   He awakened Johnson and inquired if *Eckman* was at home.   Johnson responded that he was, and that he would call him out.   Fritz insisted, however, on going into the house.   Johnson went ahead, and *Eckman's* wife opened the door for Johnson but denied admittance to Fritz, and attempted to close the door and shut him out. However, Fritz pushed the door open and went into the kitchen.   Johnson had gone through the dining-room and up the stairs to his room.   *Eckman* was partially asleep on a bed in a room adjoining the kitchen, and a nephew of Mrs. Eckman was lying on a lounge near the kitchen door.   Fritz immediately began trouble with Mrs. Eckman, she claiming that he grabbed her by the hair and throat, whereupon she screamed for assistance.   Johnson returned to the kitchen and found the nephew and *Eckman* engaged in a scuffle with Fritz, and Johnson joined in the affray.   Just what happened in the kitchen is difficult to determine.   All the parties were evidently greatly excited, but in the main the testimony is without dispute that a scuffle took place and that the deceased backed out of the door of the kitchen onto the porch, and down the steps of the porch onto the ground, and that he was followed by *Eckman* with a gun in his hand, out onto the porch.   The gun was held at *Eckman's* waist and was pointed downward at an angle of forty-five degrees or more. The gun was loaded with bird shot and was discharged, the shot entering the leg of the deceased four inches below the groin, cutting the femoral artery, and resulting in Fritz bleeding to death.   The floor of the porch where *Eckman* stood when the gun was discharged was thirty-seven inches higher than the ground where Fritz stood when he was shot. The distance between Fritz and *Eckman* when the shot was fired was not more than five or six feet.   It is unquestioned that the gun was not raised to *Eckman's* shoulder or aimed. The shot was fired while the gun was held at *Eckman's*

waist and pointed toward the ground.  The shot was not fired at the body of Fritz but was fired at his legs.  Ordinarily the purpose of shooting a person in the legs with bird shot is not to kill but merely to maim.  The first impartial witness on the scene after the shooting testified that *Eckman* was terribly excited.  This testimony coincides with our common understanding of such a situation.  *Eckman* had been cruelly slandered and abused by the man he had often befriended.  He had been assaulted and threatened with great bodily harm, and on the day in question his home had been invaded and his wife assaulted.  It is not within the range of human nature for a man to tamely submit to such indignities, and *Eckman,* although of a peaceful disposition and good reputation, became violently enraged, to such an extent that he did not fully appreciate what he was doing.  His reason was dethroned and passion held sway.

I think the above is a fair statement of the evidence and the physical facts.  The law, as applied to the facts, is plain.  Sec. 4350, now sec. 340.14, Stats., provides:

"The killing of a human being, without design to effect death, in a heat of passion, but in a cruel and unusual manner, unless it be committed under such circumstances as to constitute excusable or justifiable homicide, shall be deemed manslaughter in the second degree."

The evidence shows conclusively, to my mind, that *Eckman* did not design to effect the death of Fritz.  The killing was in heat of passion and in a cruel and unusual manner, and the jury were at liberty to find that the circumstances did not constitute excusable or justifiable homicide.  Under this section, as applied to the facts, *Eckman* was guilty of manslaughter in the second degree.

Sec. 4351, now sec. 340.15, Stats., provides:

"Any person who shall unnecessarily kill another either while resisting an attempt by such other person to commit

any felony or to do any other unlawful act, or. after such attempt shall have failed, shall be deemed guilty of manslaughter in the second degree."

As applied to the facts in this case, the jury were at liberty to find that *Eckman* did unnecessarily kill Fritz, after Fritz had committed or attempted to commit an unlawful act, and after such attempt had failed. *Eckman* was therefore guilty of manslaughter in the second degree under this section of the statutes.

The statutes so plainly characterize the crime of *Eckman* as that of manslaughter in the second degree that it seems that justice miscarried when the jury found him guilty of murder in the first degree. Murder in the first degree includes the element of premeditated design or malice aforethought. The physical facts demonstrate conclusively to my mind that *Eckman* did not have the design to effect the death of Fritz. No one with intent to murder would hold a gun in the attitude in which *Eckman* held his gun. The evidence as to how he held the gun is undisputed, both from the physical facts and the testimony of the State. Certainly no one designing to effect the death of another would lower a gun, loaded with fine shot, to shoot a person in the legs, when the opportunity to shoot him in the body or in the head was present. If *Eckman* designed to kill Fritz, he could with certainty have pointed his gun directly at a vital portion of his body; in fact, he could almost have reached him with the muzzle of the gun.

This being the situation of the evidence and the physical facts, we look for the reason for this strange verdict of the jury, and find it in the charge of the court.

Shortly after the assault upon *Eckman* by Fritz in October, 1922, a witness, Miss Ida Larson, was at the home of *Eckman*. *Eckman* was smarting under the injustice of the assault and then said, according to the testimony of Miss Larson, that if Fritz again came upon his premises he

would shoot him. The jury, having this testimony in mind, received this instruction from the court:

"It is sufficient if there was such a design or intent in the slayer's mind *at any moment before* or at the time of the commission of the act resulting in death."

The "design or intent" referred to in the judge's charge was the design or intent to kill Fritz. Manifestly, this charge was error, and the court so concedes. However, the court deems the error as immaterial because of other portions of the charge. Clearly the intent to kill must coincide with the shooting. The fact that several months before the shooting *Eckman* had manifested such an intent and had that intent, is not sufficient to make the offense murder in the first degree unless that intent existed at the very time of the shooting. In view of the facts here related, I feel that this error in the court's charge was prejudicial to the defendant's rights.

Further, the error above considered was reinforced by the further charge of the court, to wit:

"In the absence of evidence to the contrary, one who takes the life of another by the infliction of a wound by some act naturally and probably calculated to produce death is presumed to have intended that result; and when one points a loaded gun, which the law says is a dangerous weapon—even if broken, as has been testified the gun in question was broken—at a vital part of the body of another and voluntarily discharges it with the intention, at least, of disabling the latter, and the life of the person thus fired upon is taken in consequence of such act, the law presumes that the natural, usual, and ordinary consequences of the act were intended, and hence that death was intended."

This charge was erroneous in several particulars. It is plain that it was directed to the particular circumstances of the shooting in this case, and it is equally plain that the facts therein assumed were assumed as the proven facts in the case, and no doubt the jury so understood. The charge implied

that the shooting was naturally and probably calculated to produce death, and that *Eckman* was presumed to have intended that result. It has been shown that the act of *Eckman* in pointing and discharging a gun loaded with fine shot at the legs of Fritz was not naturally or probably calculated to produce death. Again, the court assumed that when *Eckman* pointed the gun at Fritz he pointed it at a vital part of the body of Fritz, when in fact the gun was not pointed at a vital part of the body as generally understood or as *Eckman* would understand. This last charge, in view of the evidence and the physical circumstances surrounding the shooting, seems to be clearly erroneous and prejudicial. The fact that in other portions of the charge correct instructions were given, does not take away from the fact that under this portion of the charge the jury may have been and probably were misled to the prejudice of the defendant.

A case is presented where a large and powerful man, in the prime of life, persistently abused and bullied a peaceful, little, old man without cause. He finally entered defendant's home against defendant's consent and assaulted defendant's wife. Defendant became enraged and his reason and judgment succumbed to passion. He shoots the assailant with fine shot in the leg, and an unusual result follows. He is condemned to the same punishment as one who kills from premeditated design to murder, notwithstanding the statutes define his crime, assuming the State's claim to be true, as manslaughter in the second degree.

On the whole case, I reach the conclusion that the judgment and sentence of the court should be reversed and a new trial ordered.

Eschweiler, J. I join in this dissent.

A motion for a rehearing was denied, without costs, on October 12, 1926.