STATE, Respondent, vs. TAUBENHEIM, Appellant.

*March 15—April 9, 1940.*

*Daniel D. Sobel* and *Joseph A. Padway,* both of Milwaukee, for the appellant.

For the respondent there was a brief by the *Attorney General, Herbert J. Steffes,* district attorney of Milwaukee county, and *Gene L. Green,* assistant district attorney, and oral argument by *Mr. Green.*

ROSENBERRY, C. J. At the time of the murder Arthur Taubenheim was twenty-two years of age and employed at a night club. Virginia Taubenheim, the decedent, was eighteen years of age, weighed eighty-eight pounds, and was five feet two and one-half inches tall. On the morning of August 5, 1936, Taubenheim arrived home about 5 o'clock a. m. He and Mrs. Taubenheim had breakfast when they retired. At about 10 a. m. Taubenheim's parents came for a call. The Taubenheims had one child, an infant, eight months of age. After the arrival of Taubenheim's parents, the defendant went to the basement in response to a call from Mrs. Montfort, who occupied rooms below the Taubenheim flat, to sell

scrap to a ragman. When he returned his parents had gone, and he and his wife had a quarrel about his attentions to Mrs. Montfort, after which the defendant went to a near-by tavern where he had some beer. He returned home, drank some whiskey from a bottle, and the quarrel was continued. During the quarrel the defendant took a thirty-two caliber Smith & Wesson revolver from a dresser drawer. The cylinder contained five chambers, in three of which were cartridges. He took the gun, arranged it so the hammer would strike an empty chamber, and then threatened his wife, saying: "Now if you don't stop your arguing, I am going to pull the trigger." He did pull the trigger, the struggle continued and, according to his story, the trigger was pulled a second time when the revolver was discharged, the bullet entering her body below the left nipple, inflicting a wound from which she died. At the time of the discharge the muzzle of the gun was six to eight inches from the body of the deceased. She fell backwards on a bed immediately after the shot was fired. Mrs. Montfort and Mrs. Buege were in the lower flat and heard the noise of the shooting which took place at 12:30 p. m. They had heard quarreling, scuffling, and a sound like the explosion of a firecracker. A few minutes after the noise was heard the defendant appeared at the door of the Montfort apartment, stating his wife had injured her leg in the discharge of a firecracker and asked for iodine. Mrs. Montfort having no iodine, mercurochrome was given him instead, which he applied to the wound. He had placed a damp towel upon her forehead before going for the iodine. The defendant then called a doctor, telling the doctor his wife had shot herself. The doctor came, ascertained the nature of the wound, and directed her removal to the county emergency hospital. The doctor made no inquiry as to how the wound had been inflicted. The ambulance came for her, and men arrived from the police department to make the necessary investigation. The defendant was questioned by members of the depart-

ment, and adhered to his original statement that his wife had committed suicide. It having come to the attention of the police authorities that he had made statements which were inconsistent with his claim of suicide, further investigation was made. When he was confronted with the facts disclosed by the investigation on the afternoon of the next day, he changed his story and declared that the gun was discharged by himself in a struggle with his wife. The postmortem disclosed the path of the bullet, and also the presence of three black and blue marks on the left side of the deceased's face, extending from the rear to the front of her jawbone, and also a bruise on her right thigh.

Upon the trial the only direct evidence offered by the state to establish the shooting of the deceased by the defendant was admissions made by the defendant to the police officers. There were many corroborating circumstances which it is not necessary for us to state.

Upon this appeal review is sought upon the following grounds: (1) That the evidence does not sustain a verdict of murder in the first degree; (2) Evidence was erroneously admitted over the objection of the defendant; and (3) error in the instructions.

(1) Upon the first proposition it is the contention of the defendant that the evidence does not show that in firing the shot which resulted in the death of his wife, the defendant acted with the premeditated design to take life which is necessary to sustain a conviction of murder in the first degree. The court submitted, for the consideration of the jury, murder in the first and second degrees, and manslaughter in the first, third, and fourth degrees. The jury were fully and correctly instructed with respect to these various degrees of murder and manslaughter. There was considerable corroborating evidence of the fact that the shot was not fired by the deceased,—the path of the bullet, the position of her body, the fact that she was a slight woman weighing eighty-eight pounds, while the defendant was a

strong, able-bodied man, were facts from which the jury might well find that the shooting was intentional and so premeditated. The jury quite evidently did not believe that it was accidental or brought about in the heat of passion or done without intent to take life.

(2) In this connection we may consider the second assignment of error,—that the court erred in admitting evidence over the objection of the defendant. This assignment of error relates to testimony given by one Olson. It should be remembered that the killing took place on August 5, 1936. Olson testified that he and his wife were visiting at the home of the defendant on May 29, 1936; that the defendant and Olson went out to buy some beer, pretzels, and potato chips; that they returned home with the beer but without the pretzels or chips; that the deceased and Mrs. Olson decided they would go out and get the pretzels. They were gone something like half an hour longer than the defendant thought they should be, whereupon he criticized his wife, became angry, and went into the bathroom and closed the door. Both the deceased and Mrs. Olson called him and he refused to come out when Olson offered to go in and persuade him to come out. Olson testified that the defendant was so angry that he was pulling his hair and was red in the face, and then, over objection, Olson testified the defendant said: "Some of these days I will get so mad I will shoot her." This was some nine weeks before the homicide. There is other evidence in the record which indicates that the use of firearms was frequently in the mind of the defendant. On this same occasion Olson testified that defendant stuck the revolver in his (Olson's) ribs in a playful, joking way. A sister-in-law of the decedent testified that while she was at his home the defendant once produced a revolver, flourishing it in such a way as to frighten her small child who was with her. According to the defendant's own story he had told the deceased a few minutes before the homicide that if she did not stop nagging him he would pull

the trigger. He knew there were three cartridges in the cylinder, that if the trigger was pulled a second time the revolver would be discharged. In spite of that, according to his own confession, he pulled the trigger. He did not cock the revolver, it was a self-acting weapon.

The general rule is that a threat to do a criminal act is admissible in evidence. 1 Wigmore, Evidence, p. 338, § 105, p. 344, § 108, and cases cited.

In *Barber v. State* (1920), 172 Wis. 542, 545, 179 N. W. 798, the defendant was charged with an assault with intent to rape. A witness was permitted to testify as to a threat made by the defendant about fifteen months previous to the time of the assault. This court said:

"The question of whether or not declarations and threats of a defendant are so remote in time as to lack probative effect is a question resting largely, if not entirely, in the discretion of the trial court. . . . We are clear, however, that in this case there was no abuse of discretion in admitting the defendant's declaration. The fact that the declaration was made many months prior to the time of the assault affects its weight and not its admissibility and is a circumstance which should be, and no doubt was, taken into account by the jury."

It is considered that the court was not in error in admitting this testimony. Certainly it cannot be said that the court abused its discretion. Considering the threats, the conduct of the defendant, and the whole record in the case, the verdict of the jury is well supported by the evidence.

(3) The court instructed the jury as follows:

"While the law requires, in order to constitute murder in the first degree that the killing shall be wilful, deliberate, and premeditated, it does not require that the wilful intent, premeditation or deliberation shall exist for any particular length of time before the crime is committed. It is sufficient if there was a design and determination to kill distinctly formed in the mind of the defendant before he committed the act charged against him which caused the death of Virginia Taubenheim, if such defendant committed such act and

such act caused such death. It is not necessary that the killing should have been brooded over, considered or reflected upon for a week, or a day, or even an hour. There may be no appreciable space of time between the intent to kill and the act of killing. If sufficient deliberation was had to form a design to take life, and to put that design or purpose into execution by destroying life, then there was sufficient deliberation to constitute murder in the first degree, no matter whether the design to take life had been for a long time contemplated by the slayer, or whether the design was formed by him for a short time before the fatal act. It is enough that the intention to kill preceded the fatal act.

"The intention or premeditated design to kill, which is an essential element of murder in the first degree, is no more or less than the mental purpose to take human life, formed on the instant preceding the fatal act or some time theretofore; it being sufficient that there was a precedent existence of the purpose and persistency of it to and inclusive of such fatal act."

[Instruction relating to drunkenness.] . . . "If you find from the evidence and circumstances in this case beyond a reasonable doubt that the defendant killed Virginia Taubenheim, and that any time before doing the act which caused the death of Virginia Taubenheim the defendant had formed in his mind the wilful, deliberate and premeditated design to take the life of Virginia Taubenheim or of any human being, and that the act was in pursuance of such design, then you should find the defendant guilty of murder in the first degree."

This instruction is criticized on the ground that it did not inform the jury that the intent to kill must coincide with the shooting. It is considered that this criticism is not warranted. This is so plainly manifest from a reading of the instruction that further discussion would not be helpful. See *Hogan v. State* (1874), 36 Wis. 226; *Perugi v. State* (1899), 104 Wis. 230, 80 N. W. 593; *Eckman v. State* (1926), 191 Wis. 63, 209 N. W. 715.

*By the Court.*—Judgment affirmed.